*RE: I NEED THE BOOK, JAR GEB, Document 46-1 AM I NOT ALLOWED TO CHEAK WHAT?*

**INMATE REQUEST TO STAFF MEMBER** (EXHIBET-A-1)

To: ___LAW LIBRARY___                              Date: ___7-8-2022___
    (Name and Title of Officer or Department)

___Arthur___
    Unit Team Member Signature

**To be retained by Inmate**

**Form 9**
For Cellhouse Transfer
Work Assignment _____
Interview Requests

B1-122

BROWN
Last Name Only

**KANSAS DEPARTMENT OF CORRECTIONS**

57800
**Number**

**INMATE REQUEST TO STAFF MEMBER**

To: ___LAW LIBRARY___                    Date: ___7-8-2022___
    (Name and Title of Officer or Department)
    State completely but briefly the problem on which you desire assistance. (Be specific.)

I NEED TO READ THE WHOLE BOOK OF THE FEDERAL RULES OF
CEVIL PROCEDURE, I'VE MADE A COUPLE REQUEST FOR THE BOOK
TO BE CHECKED OUT TO ME AND NEVER GOTTEN THE BOOK, WHY
IS THIES. AM I NOT ALLOWED TO CHECK OUT THIES BOOK OR
WHAT?

Work Assignment: ___N/A___          Living Unit Assignment: ___B-1/122/EDCF___

Comment: _____ Unit Team Members Signature: _____

**Disposition:** I can't send you the book. Here's a copy of the
index. Send me what parts you need, but remember I can
only send so many at a time.

To: _____                    Date: _____
    (Name & Number)

**Disposition:** _____
_____
_____
_____

_____
    Employee's Signature                              **To be returned to inmate.**

P-0009b

Signed in as **Kansas Department of Corrections.**

Lexis® |

*(EXHIBIT-A-2)*

Home
# USCS Federal Rules Annotated

### Enter search terms

🔍

USCS Federal Rules Annotated

◉ Search All Documents in this source ○ Table of Contents (TOC) only          ☐ Search Selected

🖨

- ⊞ ☐ Federal Rules of Civil Procedure
- ⊞ ☐ Rules of Procedure of the Judicial Panel on Multidistrict Litigation
- ⊞ ☐ Rules for Judicial-Conduct and Judicial-Disability Proceedings
- ⊞ ☐ Federal Rules of Criminal Procedure
- ⊞ ☐ Rule of Procedure for the Trial of Misdemeanors before United States Magistrates
- ⊞ ☐ Rules Governing Section 2254 Cases
- ⊞ ☐ Rules Governing Section 2255 Proceedings
- ⊞ ☐ Federal Rules of Evidence
- ⊞ ☐ Rules of the Supreme Court of the United States
- ⊞ ☐ Federal Rules of Appellate Procedure
- ⊞ ☐ Rules of the United States Court of Federal Claims
- ⊞ ☐ Rules of the United States Court of International Trade
- ⊞ ☐ Rules of Practice and Procedure of the United States Tax Court
- ⊞ ☐ United States Court of Appeals for the Armed Forces
- ⊞ ☐ Courts of Criminal Appeals
- ⊞ ☐ United States Court of Appeals for Veterans Claims
- ⊞ ☐ Alien Terrorist Removal Court of the United States
- ⊞ ☐ Foreign Intelligence Surveillance Court of Review
- ☐

(EXHIBIT-B-1)       (EDKF)
                    (2022)
                    (A-2)

As per G.O. 14-101, II, C.,

5a. "Legal materials shall be limited to those items necessary for an offender to research the law related to, or pertinent to THEIR current cases of incarceration."

5b. "The librarian shall assign legal clerks to attempt to find requested material AS LONG AS THE REQUEST IS SPECIFIC ENOUGH TO IDENTIFY THE MATERIAL NEEDED.

Due to the volume of daily requests from offenders for legal material the legal clerks are unable to perform effective legal research. Only specific requests (with exact case names or numbers) that pertain to your case can be filled quickly.
Please be patient and provide as much information as possible.

When possible the Legal Library clerks will attempt to find requested material as long as the request is specific enough to identify the material needed and those materials are necessary for an inmate to research the law related to their incarceration. If the request is beyond the scope of our expertise and to ensure that you receive accurate legal information a representative from Legal Services for Prisoners is available to aid indigent inmates in legal matters concerning criminal, habeas corpus, and domestic cases. To request assistance, inmates shall submit a Form 9 to Legal Services for Prisoners.

( NOTE: LEGAL SERVICES FOR PRISONERS WILL NOT ASSIST PRISONERS
IN LAWSUITS FOR DAMAGES. )

*(EXHIBIT=B-2)*

Date:        June 28, 2022

To:          David Brown, #57800

From:        Steven C. Sherwood, Attorney
             Legal Services for Prisoners, Inc.

Mr. Brown:

The library forwarded your fom-9 regarding federal motions to this office for
response. However, this office is not authorized to give advice or consultation on
civil matters in federal court and are not funded to maintain the U.S. Code. I am
therefore limited to suggesting you review Title III, Rules 7 through 12, of the
Federal Rules of Civil Procedure if the library can provide them, keeping in mind
the general rule that if allegations raised in a pleading are not denied or refuted,
they may be considered admitted by the court.

ORDERED
7-8-2022

Steven C. Sherwood, Attorney
SCS/ms

(NOTE: RECEIVED  7-1-2022 / B-1 / 122 / EDCF / APPROX 3:19 PM /

NOTE: GRIEVANCE RECEIPT SUBMITTED TO UNIT TEAM BUCHHOLZ IN B-1 CELLHOUSE
ON 6-24-2022 AT APPROX 3:24 PM B-1/122/EDCF

RE: PC / RETALIATION / CELL-EE / FALSE D.R.

Tear off and give to inmate when submitted to Warden through Unit Team

APPROX 3:24 PM
U.T. BUCHHOLZ
B-1/122/EDCF
6-24-2022

Inmate Name _DAVID BROWN_ Number _57800_

Unit Team Staff Signature _WBB_ Date _6-24-2022_

RE: PC / RETALIATION / CELL-EE / FALSE D.R. /

Tear off and give to inmate when submitted to Unit Team through receiving staff.

Inmate Name _DAVID BROWN_ Number _57800_

Receiving Staff Signature _UTS Webster_ Date _6-2-2022_

**Effective Date (3-18-96) P-157**

T. U.T. WEBSTER
6-2/145/EDCF

NOTE: GRIEVANCE RECEIPT SUBMITTED TO UNIT TEAM WEBSTER 6-2-2022
IN C-2 CELLHOUSE

# KANSAS DEPARTMENT OF CORRECTIONS INMATE GRIEVANCE FORM

(Q)

## INMATE COMPLAINT

Inmate's Name _DAVID BROWN_        Number _#57800_

Facility _EL DORADO CORR. FAC_ Housing Unit _B-1/122/RMU/_        Work Detail _N/A/ADMIN. SEG_

(PAGE-1-OF-2)

**NATURE OF COMPLAINT** BE SPECIFIC. (Include names, dates, places, rules, regulation, etc.; how you have been affected and action you believe the Warden should take.) Use additional paper if necessary. ATTACH DOCUMEN-TATION OF ATTEMPTS AT INFORMAL RESOLUTION PRIOR TO FILING THIS FORMAL GRIEVANCE (i.e. Form 9s or other correspondence and response from staff member). ATTACHED IS A (12) PAGE DISCIPLINARY APPEAL TO THE SECRETARY OF CORRECTIONS CASE NO. 22-05-222 DATED 7-7-2022) MY COMPLAINT IS THAT I DID NOT RECEIVE THE (CAMERA) DUE PROCESS IM REQUIRED TO RECEIVE BY LAW, MY COMPLAINTS THAT K.D.O.C.'s DISCIPLINARY PROCEDURE IS A BIASED, FALSE, COUNTRPRODUCTIVE, RUBBER STAMP APPEAL PROCESS, RETALIATORY TOOL KDOC OFFICIALS/ STAFF USE TO PUNISH PRISONERS, A FABRICATION RECORD CREATOR, A GIVE STAFF IMMUNITY PROCESS, A MONEY STEALING SCAM, A IGNORE K.D.O.C. RULES WHEN THEY ASSIST A PRISONER PROCESS, A CORRUPTED PROCESS, A PUNISHMENT PROCESS THAT VIOLATES THE U.S. CONSTITUTION, KANSAS CONSTITUTION, AND K.D.O.C. RULES, REGULATIONS, AND POLICY. MY COMPLAINT IS THAT CS1/OIC DONNA VETTER WROTE ME A FALSE RETALIATORY DISCIPLINARY REPORT FOR EXPOSING HER →

Date this report was given to Unit Team for informal resolution (to be completed by inmate). _8- -2022_ (Q)

## UNIT TEAM RESPONSE (Complete and return to inmate within 10 calendar days.)

_____

Unit Team Signature                                          Date

## INMATE RESPONSE (Complete and return to Unit Team within 3 calendar days)

_____ I am satisfied with the Unit Team response and wish to withdraw my formal grievance.

_____ I am not satisfied with the Unit Team response, and wish to forward to the Warden's office. (This must be done within 3 calendar days.) Date forwarded to Warden's Office (to be completed by staff). _____

_____

Inmate Signature                                          Date

## WARDEN RESPONSE (Complete, attach response and return within 10 Working days.)

```
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXIXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

THESE SHEETS ARE SEPARATED FROM THE ABOVE, DO NOT WRITE BELOW THIS LINE

*(RE: EXHIBIT TO DOC. NO. 35)*

Attachment B, IMPP 11-119
Effective: 12-11-13

# DISCIPLINARY REPORT

*( EXHIBIT-A )*

<u>EDCF Central</u>
    (FACILITY)

| | | |
|---|---|---|
| Case No. 22-05-222    Date of Alleged Violation: 05/31/2022 | Time: 1930   A.M. / P.M. |
| Date This Report Written:    05/31/2022 | Time: 1950   A.M. / P.M. |

Name of Inmate: <u>Brown</u>      <u>David</u>      No. <u>57800</u>    Cell No: <u>CC145</u>
         LAST         FIRST         MI

Duty Assignment: <u>Segretion Long term step down</u>

**Alleged Violation of Law or Rule** *(Identify by Code No., Short Title, and Class)* <u>44-12-306 Threatening or Intimidating any</u>
<u>person  a  Class I Offense</u>

FACTS: <u>I CSI Vetter went over to the C2 side cell 145 to speak with resident Brown. Resident Brown had a complaint about</u>
<u>the shower. He had been told to shower in shower 6 or he could not shower. I told him I would inspect the shower to see if it</u>
<u>was in bad shape. He did not like this answer and stated, " I could spit on and head butt staff for this." Since no one is to</u>
<u>threaten staff directly or indirectly I  Therefore  am writing resident Brown for 44-12-306 Threatening or Intimidating any person.</u>
<u>A class I offense.</u>

(Attach Additional Sheet(s) if necessary)
(Signature)

Staff Witnesses: _____
COI McKinney _____

Donna K. Vetter      CSI     S/M/T
Printed Name and Title of Employee Writing Report

Approved by: _____ Capt _____

(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on _6/1/22_       Signature _____

I received a copy of this report on _____
                         (Date)       (Time)           (Inmate
I served a copy of this report _C-1-22_ , _9:53_ , _CSI_
                         (Date)       (Time)        (Signature of Offi

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be g*
*prejudice to the inmate, which is the burden of the inmate to provide. Pursuant to K.A.R. 44-13-707. He*

Brown
B1-112

Got at approx 4:53 PM
to Williams B-1/22
DR askin form

*(RE: EXHIBIT B TO DOC NO 35        )*

# Health Services Request Form

*(EXHIBIT - B )(DOC NO 42)*

| For Medical Use Only | |
| --- | --- |
| Sólo para uso médico | |
| Date Received: | |
| Time Received: | 0200 |

Print Name (Imprimir nombre): DAVID BROWN

Date of Request: 6-6-2022

ID #: 57800            Date of Birth (Fecha de nacimiento): 11-6-74

Housing Location (Ubicación de la vivienda): A-2/259/FDCF

Nature of problem or request (Naturaleza del problema o solicitud): MY BACK IS INJURED
REALY BAD. IT HURTS TO SIT UP, ITS A KNOT LIKE AND THROBS AND
HURTS 24/7. BEEN GETTING WORSE TOO. I NEED PAIN MEDS AND
MUSCLE RUB, WHICH IM UNABLE TO PURCHASE ON CANTEEN DUE TO AdMIN
SEGG. SAVING STATUS. ID ALSO LIKE TO SEE THE DOCTOR TO GET MY

I consent to be treated by health staff for the condition described. BACK RUB FIX AS ALL
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)
POSSIBLE TO GET YOU AN IDEA OF HOW BAD MY INJURY IS JUST
I understand that my requesting health services does not necessarily mean that I agree that I should be
assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may
file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be
assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up
visit or referral. IMAGINE SOMEONE PICKING ME UP IN THE AIR
AND SLAMMING ME ON THE GROUND.
(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de
acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no
estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de
conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de
salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si
no se trata de una visita de seguimiento o por una derivación.)

David Brown
Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este articulo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

---

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: _____   ☐ Routine   ☐ Urgent   ☐ Emergent

Date: 6/7/22            Time: 0200

Date of Face-to-Face Visit: _____

Other: _____

Response Recommendation (to be completed by Medical Staff only)

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☑ ARNP |
| Appointment | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |

Fee Charge ☑ $2.00

Comments: ibuprofen x 7 days, muscle rub

_____ APRN            dp/08/2022

Staff Signature                    Date



Centurion: REC-013KS
07/01/2020

RE: GRIEVANCE (Q) / PAGE-2-OF-2 )                    ( Q )

UNPROFESSIONAL SEXUALLY INAPPROPRIATE INTERACTION(S) WITH HER CO-SHORE, WHO SHE WAS ALLOWING TO MASTURBATE TO HER FACE, FACIAL EXPRESSIONS, HER BREAST AS SHE PUSHED THEM TOGETHER FOR HIM, ETC., AND BECAUSE I EXPOSED HER AND HER ACTIONS SHE WROTE ME A RETALIATORY DISCIPLINARY REPORT, THEN, WHICH SAID NOTHING ABOUT WHAT SHE DID AND/OR WAS DOING, THAT D.R. ONLY SAID THE THINGS I SAID TO HER, AFTER SHE PROVOKED ME, FIRST BY LEAVING MY MAIL SO FAMILY ON THE DAYROOM FLOOR, THEN CLAIMING I THREW IT AT HER, ALTHOUGH I LIVED ON THE BOTTOM RUN AND SLIDE IT ON THE RUN REQUESTING SHE MAIL IT WHEN SHE'S DONE) AND THEN I SNAPPED AND CUSSED HER OUT BECAUSE SHE REFUSED TO GET MY LETTER AND C/O ANDERSON HAD TO GET IT, AND I CUSSED HER OUT CALLING HER SLUT A NAPPER (OR) SLEAZY WHORE*** AND A LYING CUNT, AND ETC. AND ALTHOUGH SHE WROTE ME LIKE 3 MORE D.R., IN THE NEXT COUPLE WEEKS, IT WAS YEARS AGO, AND SHE WAS IN THE WRONG 100 %, YET TODAY 2022 SHE IS STILL HOLDING A GRUDGE AND WROTE ME ANOTHER LYING RETALIATORY D.R. NOW SHE'S JUST MAKING THINGS UP OUTRIGHT LYING, AND HEARING OFFICER MARLEY OUTRIGHT LIED DURING THE D.R. HEARING, AS WELL ON THE RECORD HE CREATED. NOT TO MENTION THE (12) PAGES OF TRUTHFUL FACTS I DOCUMENTED IN THE ATTACHED APPEAL, BUT OF COURSE THE RUBBER STAMP APPEAL PROCESS PROVIDED NO RELIEF NOR DOES THE GRIEVANCE PROCESS. MY COMPLAINTS THAT THE WHOLE D.R. PROCESS IS CORRUPT, BEATEN, ILLEGAL, A MONEY TAKING AWAY FROM J.M'S SCAM, AND IT NEEDS ADDRESSED/CORRECTED. MY COMPLAINT IS THAT IF I WAS GONNA THREATEN ANYONE IT WOULD OF BEEN THE GUARDS THAT DEMANDED I STAND IN FILTHY SEWAGE WATER OR BE DENIED A SHOWER! THIS D.R. NEVER SHOULD OF BEEN WRONG, NEVER SHOULD OF BEEN APPROVED SHOULD NOT OF PRODUCED A GUILTY FINDING, AND SHOULD OF BEEN OVER TURNED ON APPEAL, BUT BECAUSE OF CORRUPTION, AND A LACK OF D.R. DUE PROCESS NONE OF THE THINGS THAT SHOULD OF HAPPEN HAPPENED, AND MY COMPLAINT IS THAT, THE FACT THAT D.R.'S IS JUST LEFT



## DISPOSITION OF DISCIPLINARY CASE

| INMATE NAME & NO  # BROWN, DAVID    #57800 | CASE NO.  22-05-222 |
|---|---|

### *TESTIMONY*

| |
|---|
| Date & Time:  06/30/22    0530 hrs.                    Hearing Officer: CSI Marley |
| Hearing begins:  In Person |
| H/O reads report into record, reviews summons, time limits of receipt, and witness list, all of which are in order to proceed with hearing. |
| Offender sworn in, acknowledges that he received a copy of the DR and Summons |
| H/O asks offender for plea to charges Offender plead: Not Guilty |
| H/O receives any motions from offender: None presented written or verbal. |
| H/O reviews charges or amendments to charges:  Charges stand as written |
| H/O reviews evidence and/or video: @1900 hours offender take to shower by the COIs on duty. Appears to refuse shower #6, escorted back to cell without incident. At 1912 back in cell. At 1914 CSI Vetter at door, no one else present. At 1917 CSI Vetter to officers station, at 1918 CSI Vetter to sally port. |
| Statement: I did not threaten anyone. I told Vetter that I didn't do anything to get beat on a shower. I said I didn't spit on staff, hit staff, cuss staff, kick staff or anything like that to be deny a shower. She said she would inspect the shower then just put a grievance in and she would put a work order in. Just because I wouldn't stand in a foot of sewage water left in the shower.  The only person at my cell was Vetter. I never saw McKinney who is listed as a witness. I didn't threaten anyone If I would have it would have been the officer who took me to the shower, not her. She has long standing issue with me. |
| CSI Vetter sworn in. |
| Offender: Did you go to the shower and check the sewage in the shower? |
| R/O: No |
| Offender: Did staff tell you I threatened you? "THEM"/ I SAID, DID STAFF TELL YOU I THREATEND THEM? SHE SAID, YES" |
| R/O: Another staff member said you did when I was standing at the door. |
| H/O interjects and advises that he has received information from COI McKinney that she was in CCH control that day and was listening in on the intercom. H/O officer verifies with CSI Vetter that this is the staff member who also heard the threat to which the answer is yes. |
| Offender: Staats and Stevenson were working that night and you don't remember who told you. |
| R/O: No |
| H/O advises offender to keep line of questions regarding the charge brought against him. The COs that were working in the cell house that night are immaterial as they were not present when the R/O states the threats were made. |
| Offender: What did they say I said? |
| R/O: It's not what you said to them, it's what you said to me. |
| Offender: Did I threaten you? |
| R/O: Yes |
| Offender: What did I say? |
| R/O: It's in my report                                          McKinney |
| H/O reads again charges brought against the offender.        AND C/o McKinney |
| Offender has no further questions for R/O. |
| Offender wishes to call COI Staats and COI Stevenson. H/O denies this request per KAR 44-13-403(n)(2) as neither of these officers were present at or near the cell during this interaction where the alleged offense occurred. |
| Closing statement: I did not say that, McKinney didn't hear me as I had put toothpaste in the speaker and that blocks the sound. If I had threatened staff I would have threatened everyone. Look at my history, I have tons of staff batteries but I'm not like that anymore. I had an incident with her years back and she's been holding a grudge. When she came over she didn't do it to resolve an issue. She gave me grievance and said she'll put in a work order. |
| H/O reviews the facts of the case, based off of R/O testimony and previous COI statement that she was listening in the intercom, H/O finds the offender Guilty. |
| H/O advises of sanctions |
| Sanctions: 306—7 Days Dis Seg, 30 Days Rest., $20.00 Fine    TOLD ME TO FILE A LAW SUIT |

NOTE: SENT TABLET FORM 9 TO U.T.U./RESTRICTIVE HOUSING UNIT ADMINISTRATOR, LEWIS NOTICE I WAS SUBMITTIN MY D.A. APPEAL TODAY - 7-7-2022

NOTE - I GAVE MY APPEAL (2) PAGES TO UNIT DUCHMELL AT APPROX 12:30 PM/B-1/122/EDRE/7-7-2022

## APPEAL OF GRIEVANCE TO SECRETARY OF CORRECTIONS

(G)

Inmate Name: _DAVID BROWN_ Facility: _ELDORADO CORR. FAC./81/122_

Inmate Number: _#57800_ Grievance Serial No.: _CA22655(G) DATED 6-2-2022(G)_

(Attach grievance report with Principal Administrator's response or explanation why Principal Administrator is bypassed.)

MAIL TO:  Kansas Department of Corrections           Date Mailed: _7-1-2022_ (G)
          714 SW Jackson
          Suite 300                                  RECEIVED
          Topeka, KS 66603           (PAGE-1-OF-5)    JUL 07 2022
                                                      DOC Facility Management Area

Tell the Secretary what you feel the Principal Administrator should have done, and state what action you believe the Secretary should take.  (Use extra paper as needed.) _I'VE STATED THE FACTS IN THE ATTACHED FORM-9 AND GRIEVANCE AND MADE MY COMPLAINTS, AND REQUEST, AND I INCORPORATE ALL OF IT, AS IF IT WAS RESTATED FULLY HEREIN THIS APPEAL. EDCF WARDEN, TOMMY WILLIAMS, UNIT TEAM MANAGER DAVID LEWIS, UNIT TEAM ABEL AND BUCHANAN SHOULD HAVE GRANTED MY REQUEST FOR PROTECTION A FEW MONTHS AGO, BUT AT THE VERY LATEST WHEN I SUBMITTED THIS FORM-9, DATE 5-17-2022 ATTACHED TO THE GRIEVANCE, AS I MADE A OFFICIAL REQUEST FOR PROTECTIVE CUSTODY (P.C.)..._
Signature of Inmate _David Brown_  _NEXT PAGE → →_

---

**DECISION BY SECRETARY OF CORRECTIONS** (to be completed and returned with 20 days)

If applicable – Confidential File No. _____

Date Received in Office of Secretary of Corrections: _____

Date of Final Answer: _____    Date Sent to Inmate: _____

Finding of Fact:

Conclusions Made:

Action Taken:

_____
Signature of Secretary of Corrections

---

**For D.O.C. Staff Use Only**

Type of Response (Item 6b:  Code    01, 02, 08 or 09) _____

DC 090, Effective May 21, 2014



RE: GRIEVANCE APPEAL (G) / PAGE-2-of-5 )

IN THIS FORM-9, I EXPLAINED I'M IN DANGER DUE TO E.D.C.F, L.C.F, AND H.C.F. STAFF LABELING ME A RAT, SNITCH, P.C. CHECK IN, PUNK, B****, FAG, CHOMO, CHILD-MOLESTED, AND I'VE EXPLAINED I'M IN FEAR OF MY CELLIE, HAVE BAD VIBES, DON'T FEEL SAFE, WORRY ABOUT MESSAGES COMING FROM OTHER PRISONS, AND I EXPLAIN I'M NOT GONNA BE FORCED TO BE STABBED OR STAB SOMEONE BY BEING DUMPED IN POPULATION. I EXPLAINED IT WASN'T WORKING WITH MY CELLIE DUE TO U.T.M. LEWIS COMING TO MY CELL IN FRONT OF MY CELLIE TRYING TO SEND ME TO POPULATION THEN AND THERE, BUT I REFUSED FOR FEAR OF BEING STABBED OR JUMPED, AND MY CELLIE WASN'T HAPPY HE WAS LIVING WITH A COWARD AND IT STARTED GOING DOWN HILL, THEN EAI SISSELL BRETT COMES TO MY CELL # 259 DOOR IN A-2 CELLHOUSE, IN FRONT OF MY BUNKIE, SAYING HE'S THERE TO FIND OUT WHAT THE ISSUES ARE, ABOUT THE PAPER WORK I TURNED IN, AND INTENTIONALLY MADE SURE MY BUNKIE KNEW I TURNED IN THE ATTACHED FORM-9 DATED 5-17-2022, IT'S DUE TO THIS FORM-9 EAI EAI SISSELL CAME TO SPEAK TO ME ON 5-23-2022, CLEARLY WHEN THE FORM-9 SAYS IT'S NOT WORKING OUT WITH MY CELLIE EAI SISSELL SHOULD HAVE HAD ME ESCORTED OUT OF THE CELL TO SPEAK TO HIM, BUT INTENTIONALLY DID NOT SO HE COULD BUST ME OUT TO MY CELLIE AND ATTEMPT TO CAUSE MY CELLIE TO HARM ME FOR PUTTING IN PAPER WORK. I HAD TO SPEAK OVER EAI SISSELL AND CUT HIM OFF BECAUSE HE WAS TRYING TO EXPOSE DETAILS INVOLVING MY CELLIE AND OUR DISCUSSION, AND I SAID WHAT DO YOU MEAN YOU WANNA KNOW WHAT MY ISSUES ARE, I'VE DOCUMENTED THROUGH IN NUMEROUS FORM-9S AND GRIEVANCES AND GRIEVANCE APPEALS, STAFF RETALIATE AGAINST ME FOR EXERCISING MY FIRST AMENDMENT RIGHTS AND LABEL ME A RAT, CHECK-IN, PUNK, CHILD-MOLESTER, FAG, B****, SNITCH, ALL LABELS / JACKETS THAT ARE DANGEROUS TO HAVE IN ANY PRISON, AND STAFF HAVE PUT HITS ON ME, HAVE CAUSED ME SO MANY ISSUES, WHAT DO YOU NEED THE GRIEVANCE SERIAL NUMBERS I'VE EXHAUSTED ALL THESE ISSUES! WHAT DO YOU MEAN YOU'RE TRYING TO FIGURE OUT WHAT THE PROBLEM IS, IT'S DOCUMENTED OVER AND OVER AND OVER AGAIN. THEN EAI SISSELL SAYS HE'S GOT FIVE (5) OTHER GUYS TO SPEAK TO BESIDES ME AND DOESN'T MEAN TO CUT ME OFF BUT HE'S GOTTA GO, AND HE LEFT. MY CELLIE WAS NOT HAPPY, MY CELLIE STARTED TALKING ABOUT EAI ARE REAL COPS AND I'M MAKING HIM LOOK BAD BY HAVING THE COPS AT HIS CELL, IT'S COMMON SENSE FOR ONE AND FOR TWO EAI SISSELL (ONE NEW) AND KNOWS HIS ACTIONS HAVE CONSEQUENCES FOR OTHERS HE'S CHARGED TO PROTECT, THIS CAUSED SERIOUS ISSUES BETWEEN ME AND MY CELLIE. I WAS IN A STATE OF FEAR 24/7, WASN'T ABLE TO EAT MY MOST TRAYS, WASN'T ALLOWED TO GET OFF MY TOP BUNK UNTIL HE SAID, WASN'T ABLE TO DO MY TIME, I WAS THREATENED IF I SPOKE TO STAFF, COULDN'T SEND OUT A LETTER, MY PHONE CALLS MONITORED. SO I WAS MOVED OUT OF A-2 CELL #259, FINALLY ON, 5-26-2022 TO C-2 CELLHOUSE CELL # 155 A CELL WITH NO POWER, AND THERE WAS ONLY APPROX 40 PEOPLE IN THE WHOLE CELLHOUSE

→       →       →   NEXT PAGE   →       →       →

(G)

(RE: GRIEVANCE APPEAL (G) / PAGE-3-OF-5 )

AND ANOTHER I/M, WADE, WAS MOVED IN THE CELL WITH ME, WHICH DURING MY SEGREGATION REVIEW WAS MADE CLEAR TO ME THAT I COULD GET A CELLIE, AND U.S.M. LEWIS IS A LIAR SAYING I WASN'T TOLD THAT, AND AS IT TURNS OUT I/M WADE TOLD ME HE WAS LIED TO AS WELL BECAUSE THEY TOLD HIM HE WASN'T GOING TO HAVE A CELLIE WHEN HE MOVED TO C-2 CELLHOUSE, SO IT'S A PATTERN OF BEHAVIOR FOR STAFF TO LIE TO I/M'S IN FEAR FOR THEIR LIFE BY SAYING THEY WON'T GET A CELLIE, ONLY TO IMMEDIATELY GET A CELLIE. ME AND I/M WADE WERE NEXT MOVED TO C-2 CELLHOUSE CELL #145 ON 5-27-2022, I WAS BEING ANNOYED AND HARASSED BY A COUPLE GUARDS, MY PHONE CALL WAS DISCONNECTED WHILE I WAS TALKING TO MY FAMILY. I WAS DENIED TOILET PAPER, GIVEN FILTHY SHEETS, DENIED CRO'S TO SHOWER IN, ETC. THEN ON 5-31-2022 UNIT TEAM WEBSTER BROUGHT ME LEGAL PAPERS I TURNED IN IN A-2 CELLHOUSE TO BE E-FILED TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS, WHICH HAD NOT BEEN E-FILED, AND WHICH UNIT TEAM WEBSTER SAID MY LEGAL PAPERS WERE FOUND ON THE DAYROOM FLOOR! I STARTED THE GRIEVANCE PROCESS ON THAT, AND HAD TO DRAFT PAPERS EXPLAINING TO THE COURT ~~[    ]~~ WHY I'M SUBMITTING PAPERS TO BE E-FILED LATE. THEN ON 5-31-2022 I WAS TOLD TO STAND IN FILTHY BACKED UP SEWAGE WATER WITH PUBIC HAIR, SPIT OR CUM FLOATING IN THE APPROX 3 INCHES OF SEWAGE WATER IN SHOWER #6, OR I WOULDN'T GET A SHOWER. I DID NOTHING TO JUSTIFY BEING DENIED A SHOWER ONLY ONE OF THREE WE GET EVERY SEVEN DAYS ON LONG TERM LOCK DOWN, AND I TOLD THE O.I.C. (OFFICER IN CHARGE) THAT I DID SPIT, OR KICK, OR HEADBUTT, OR CUSS OUT, THROW SHIT, OR THREATEN STAFF. I CAME BACK TO MY CELL AND ASKED TO SPEAK TO THE O.I.C., AND DONNA VETTER THE O.I.C. OF C-CELLHOUSE SAID, I'M BEAT OUT OF MY SHOWER, FILE A GRIEVANCE, AND SHE'LL PUT A WORK ORDER IN. THE NEXT MORNING I RECEIVED A DISCIPLINARY REPORT (RETALIATORY) FOR INDIRECTLY THREATING STAFF E.G. SAYING I POINT DO THE ABOVE THINGS AND DID NOTHING TO JUSTIFY NOT GETTING MY SHOWER. I GOT THE D.R. FROM O.I.C. VETTER ON 6-1-2022. ON 6-2-2022 I WAS AGAIN MOVED FROM C-2 CELLHOUSE CELL #145 BACK TO A-2 CELLHOUSE IN CELL #284, WITH MY OLD CELLIE MICHAEL COUCH #127X62. MR. COUCH TOLD ME HE HASN'T HAD A CELLIE SINCE I LEFT BECAUSE UNIT TEAM BUCHANAN WAS CONCERNED ABOUT MR. COUCH KILLING HIS CELLIES AND

→   →   →   → NEXT PAGE →   →   →   →

( RE: GRIEVANCE APPEAL (G) / PAGE-4-OF-5 )     (G)

I can't help but think these prison officials want Mr. Couch to kill me, I mean they put me right back in a cell with him, after I wrote clear as day, that I'm having issues with him, and was makin a official request for protective custody. See the attached form 9 dated 5-17-2022 answered and returned to me on 5-31-2022. And I would of filed a grievance requesting P.C. monitor too, but U.T.M. Lewis refuses to answer and return my form 9 dated 4-6-2022 (2) pages w/ more detail facts explaining my need for P.C. and ~~about~~ about the conversation I had with U.T.M. Lewis at my cell #259 door in A2 Cellhouse where he tried to kick me into population that day ~~may~~ and about my concerns I explained during segregation review on 3-15-2022 and my fear of going to population and not wanting to get into any trouble, and still U.T.M. Lewis won't return my form 9 to date 7-1-2022. Another grievance is BA00018821 dated 8-26-2021 (73) that details all of these issues at H.C.F., me being menced P.C., staff continue to label me a P.C. check in, fag, punk, b★★★★, chomo, ~~████~~ the retaliation, etc... so while I'm in the cell with my old bunkie Sam called a rat, snitch, P.C. check in, coward, I'm subjected to torture and I'm either on seg too and I'm still suffered, now. My back hurts so bad it's made me cry a couple times in the morning when I wake up! And this happen after I opted for help over and over and over again, after I asked for P.C. protection after I informed unit team Buchanan, unit team manager Lewis, C.M. Sisell, and I'ts crazy these officials harm me so much, and are always over to harm me and/or get others to harm me and the warden has the nerve to say the process was handled properly. How? What process. Am I finally on P.C. or what? And how did U.T.M. at the time Lewis respond appropriately regarding my issues, to put me back in a cell with the very inmate I was in fear for my life to live with? I do too much paperwork for mistakes like this to happen. It's outright retaliation. Meant to harm and punish me, meant to cause me to stay in prison for my whole life. Meant to cause me to suffer. The secretary of corrections needs to admit all involved and hold them accountable, and to cause me to be protected when I request, need it, the first 10 times; the first time! And tru/explain why I've been refused for P.C. these years, why I'm forced to be violent and/or get hurt

NEXT PAGE → → → →

(RE: GRIEVANCE APPEAL (G) / PAGE -5-OF -5)                    (G)

AND THAT PATRICE BRANN / KS PRISONER REVIEW BOARD
NEEDS TO BE MADE AWARE OF ALL THE GRIEVANCES MENTIONED
AND THIS WHOLE SITUATION AND ITS HISTORY AND THAT I'M NOT
CONCERNED ABOUT I/M POLITICS AND ONLY CONCERNED ABOUT
SURVIVING, SAFETY, GETTING OUT OF PRISON, BEING SAFE, NOT BEING
RETALIATED AGAINST AND HOW I'VE CHANGED FOR THE BETTER
EVERYTHING. AND U.T.M. OR C.M.I LEWIS/LEWER THIS TEXT FROM
RETALIATION IS A CCCA AND THE NUMEROUS FILINGS/GRIEVANCES
PROVE IT IS RETALIATION FOR EXERCISING MY FIRST AMENDMENT
RIGHT. I JUST WAS FOUND GUILTY FOR INDIRECTLY THREATENING
STAFF I NEVER THREATENED, AND BECAUSE I WROTE GRIEVANCES
AND SENT THE U.S. DIST. COURT THE RETALIATORY DISCIPLINARY
REPORT OR TURNED IT IN TO U.M BUCKHALT ON 6-29-2022
ⓐ TO BE E-FILED TO THE COURT TO SHOW THEM THE RETALIATORY
D.R. ON 6-30-2022 THE HEARING OFFICER SHOWS UP AT MY CELL
DOOR AND FINDS ME GUILTY OF THREATENING STAFF INDIRECTLY
BY SAYING " I DON'T SPIT ON STAFF, KICK STAFF, HEAD BUTT STAFF,
CUSS STAFF OUT OR THREATEN STAFF, I DID NOTHING TO JUSTIFY
BEING DENIED MY SHOWER. THATS NOT THREATENING, BUT IT IS
RETALIATION FOR TURNING THE D.R. IN TO THE U.S. TO E-FILE TO
THE COURT. RETALIATION NEEDS TO STOP AND STAFF NEED TO HOLD
STAFF ACCOUNTABLE AND STOP 6ⁿⁱⁿᵍ ERR/OTHER IMPUNITY.
MY BACK HURTS TO BAD I CANT FINISH WRITING CANT THANK

David Brown. #57800

7-1-2022

B-1 / 122 / EDCF

B1 122 (G)

**Kansas**
*AD ASTRA PER ASPERA*
Department of Corrections

714 S.W. Jackson St., Suite 300
Topeka, KS 66603

Phone: (785) 296-3317
Fax: (785) 296-0014
kdocpub@ks.gov
www.doc.ks.gov

Jeff Zmuda, Secretary
Laura Kelly, Governor

*NOTE: TOOK OUT SIDE OF DOOR CELL #122 AT APPROX 4:15 PM B-1 CELLHOUSE/EDCF ON 8-4-2022/THURSDAY/NIGHT*

July 11, 2022

TO:     0057800 Brown, David

        El Dorado Correctional Facility

RE:     Invalid Grievance  (G) *DATED 7-1-2022/GRIEVANCE DATED 6-2-2022/FORM-9 DATED 5-17-2022*
        *APPEAL*

I received your correspondence that included an unnumbered grievance.

KAR 44-15-101 (a)(d)(2) The grievance procedure shall not be used in any way as a substitute for, or as part of, the inmate disciplinary procedure, the classification decision making process, the property loss or personal injury claims procedure, or the procedure for censorship of publications specified in the secretary's internal management policy and procedure.

Your complaint is clearly about the classification decision making process.  KAR 44-15-101 (a)(d)(2) prohibits use of the grievance procedure to address this concern.

*NOTE: WRONG — ITS ABOUT RETALIATION, STAFF REFUSING TO PROTECT ME, ENSURING ID BE HARMED, MY FIRST AMENDMENT RIGHTS,*

Sincerely,

Darcie Holthaus CMII
Corrections Manager, Facility Management

cc:     Warden Williams
        w/attachments
Image:  SOCRESP
        w/attachments

RECEIVED
JUL 29 2022
WARDEN'S OFFICE

*( I RECEIVED 8-4-2022 )*
*David Brown #57800*

RE: DAVID BROWN #57800
D.R APPEAL FORM BROUGHT TO ME APPROX 4:53 PM BY C/O WILLIAMS
IN B-1 CELLHOUSE CELL #122.

Attachment E, IMPP 11-119
Effective: 12-11-13

**KANSAS DEPARTMENT OF CORRECTIONS**
(PAGE-1-OF-9)(ADD PAGES 10 thru 12, (PAGE-1-OF-12)

| DISCIPLINARY APPEAL TO THE SECRETARY |
| CLASS I & II    22-05-222 |

| Inmate Name: DAVID BROWN | No: 57800 | Case No: 22-05-222 |

| Date of Filing Appeal: 7-7-2022 | Facility Hearing DR: EL DORADO CORR (EDCF) RECEIVED |

| Date Received Copy of Disposition 7-7-2022 | Returned Appeal to Facility: JUL 18 2022 |

**I Am Appealing the Decision of the Hearing Officer Because:**
1) I WAS NOT INFORMED OF THE HEARING WITHIN 24 HOURS OF THE HEARING PER KAR. 44-13-401 (b) WHICH SAYS I SHALL RECEIVE ADVANCED WRITTEN NOTICE OF THE HEARING. I CONTI-
2) CSI DONNA VETTER TESTIFIED THAT C/O STEVENSON AND/OR C/O STAATS TOLD HER I THREATEN-TO THEM, WHICH IS A LIE, AND WHEN I TOLD THE HEARING OFFICER MARLEY I WANTED TO QUESTION THE TWO OFFICERS VETTER IS SAYING TOLD HER I THREATENED THEM, H/O MARLEY REFUSED MY REQUEST. THATS BECAUSE H/O MARLEY KNOWS I DIDN'T THREATEN C/O STAATS OR C/O STEVENSON AND THEY DIDN'T TELL CSI VETTER THAT I DID WHICH WOULD OF BEEN PROVED BY ME QUESTIONING THEM. THE HEARING OFFICER WAS PROTECTING CSI VETTER FROM BEING EXPOSED AS A LEAR.   NEXT PAGE → → → →
(Attach Additional Sheet(s) if Necessary)

| Inmate Signature: David Brown | Date: 7-7-2022 |

| Received By: Date 7-7-22 Time 1336 Initials ___ | Date 7-1-22 Time 0800 Initials ___ |
| Unit Team ___ S.B. ___ | Disciplinary Officer ___ JUL 11 2022 |

| Facility Legal Counsel Responsive Argument: _____ EDCF |

| Signature: _____ | Date: _____ |

| **Your Appeal Has Been Reviewed and it is found that:** | **Secretary's/Designee's Final Decision:** |
|---|---|
| ☒ Substantial compliance with Departmental and Facility Standards and Procedures | ☒ Approve the decision |
| | ☐ Reinstate dismissed charges; remand new hearing |
| ☒ Hearing Officer's decision was based on some evidence | ☐ Amend charges (44-13-202) |
| ☐ The Penalty imposed was appropriate and proportionate to the offense. | ☐ Disapprove/Dismiss |
| | ☐ Reduce the penalty |
| ☐ Guilty plea or no contest, no showing 44-13-703(d)(1)(2)(3) | ☐ Suspend sentence |
| | ☐ Remand new hearing |
| | ☐ Remand for clarification of record |
| | ☐ Reduce to summary judgment |
| |    - restriction from privileges up to 10 days |
| |    - fine not exceed $10 |
| |    - extra work w/o incentive pay not more than 2 hrs/day no more than 5 days |
| |    - work w/o incentive pay not to exceed 5 days |
| |    - restitution not less than $3.00 nor more than $20.00 |
| | ☐ Remand with instructions |

| Comments: _____ |

| Secretary's/ Designee's Signature: Jelly T. Keogh | Date: 7.18.22 |

Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error: Plain error.

RE: RETURNED TO ME AT APPROX 10:35 AM BY H/O. MARLEY
IN B-1/122/EDCF/THUR/7-28-2022

DAVID BROWN #57800
CASE NO. 22-05-222

( RE-DISCIPLENARY APPEAL TO SECRETARY/ PAGE-2-OF 9 )

SUPPORTING A BIASED HEARING OFFICER.

3) K.A.R. 44-13-101 (a)(1) STATES IN RELEVANT PART, "THE INMATE
SHALL BE ENTITLED TO THE FOLLOWING:... TO RECEIVE ADVANCE WRITTEN
NOTICE OF THE CHARGE AND A FAIR HEARING BY AN IMPARTIAL
HEARING OFFICER." CLEARLY, WHEN THE CHARGING OFFICER IS OUT RIGHT
LYING UNDER OATH WHILE TESTIFYING, AND THE HEARING OFFICER
REFUSES TO ALLOW THE CHARGED I/M TO BRING THE CHARGING
OFFICERS LIES TO LIGHT, IN ORDER TO PROTECT THE CHARGING OFFICER
FROM BEING EXPOSED AS A LEAR, THE HEARING OFFICER IS BIASED.

4) HEARING OFFICER, MARLEY TOLD THE CHARGED I/M/ME, THAT
I TOLD HEARING OFFICER, OSBORN, THEN CHANGED THE NAME
TO GALLOWAY, THAT I SAID I WOULD SPIT ON C/O STEVENSON
AND/OR C/O STAATS, AND I SAID I NEVER SAID THAT, AND
HEARING OFFICER MARLEY ATTEMPTED TO AGGRESIVELY TELL ME
THAT I DID, AND I SAID I WANTED TO SUBPOENA THE PHONE
RECORD, AND HEARING OFFICER MARLEY CUT ME OFF SAYING I DONT
HAVE THE SAME RIGHTS IN A CRIMINAL TRIAL IN A DISCIPLENARY
HEARING AND I CAN'T SUBPOENA THE PHONE RECORDS, AND I SAID,
YOUR TELLING ME I SAID SOMETHING I DIDNT SAY TO THE OTHER
HEARING OFFICER, SO I WANT THE PHONE RECORD DOWN AS A WITNESS
ON MY WITNESS LIST BECAUSE IT'LL PROVE WHAT I SAID AND
DIDNT SAY. HEARING OFFICER MARLEY SAID IVE GOT THE
HEARING RECORD RIGHT HERE, AND PULLS OUT A SHEET OF
PAPER, WHICH I WAS NOT GIVEN, AND STARTED READING
THE HEARING OFFICERS RECORD, AND AS I SAID, THE RECORD
SAID, I DIDN'T (DID-NOT) SAY TO DO ANYTHING TO STAFF.
IT SAID, I SAID, I TOLD, OFC VETTER, THAT I DIDNT DO
ANYTHING TO JUSTIFY BEING DENIED MY SHOWER, I DIDNT
SPIT ON STAFF, KICK STAFF, HEADBUTT STAFF, CUSS STAFF OUT
OR THREATEN STAFF, AND I WENT MY SHOWER. HEARING
OFFICER MARLEY WAS ALREADY SET ON FINDING ME GUILTY
BY HIS ACTION, WORDS, IGNORING MY DUE PROCESS RIGHTS,
VIOLATING THE DISCIPLENARY PROCEDURES, DENYING ME
WITNESSES, ETC, AND WHEN I MOVED TO BE CORRECT IT MADE
HEARING OFFICER MARLEY UPSET, AND HE WAS VERY AGGRESSIVE
AND ARGUMENTIVE, AND REALLY SET ON FINDING ME GUILTY, IN
RETALIATION FOR PROVING HIM WRONG AT THAT POINT. I DID NOT
SAY WHAT H/O MARLEY WAS CLAIMING I SAID AND WHEN I CALMLY
( PAGE-2-OF 9 )

DAVID BROWN #57800

CASE NO. 22-05-222

( RE:DISCIPLINARY APPEAL TO SECRETARY/PAGE-3-OF-9

MOVED H/O MARLEY WRONG I DIDN'T JUST HAVE A BIASED HEARING

OFFICER BUT A RETALIATORY HEARING OFFICER

5) DURING MY FIRST HEARING TO THIS CASE THE HEARING OFFICER

REVIEWED THE CAMERA FOOTAGE AND IT WAS DETERMINED THAT THE

WITNESS OIC VETTER PUT DOWN (C/O MCKINNEY) WAS NOT AT MY CELL DOOR

WITH C/O VETTER, AND I EXPLAINED TO THE HEARING OFFICER THAT I SQWEEZE

TOOTHPAST INTO THE INTERCOM HOLES BECAUSE TOWER CONTROL STAFF LIKE TO

SPY ON AND LISTEN TO PRISONERS PHONE CALLS, OR CONVERSATIONS WITH OTHERS

SO I PLUG THE HOLES UP, AND THE TOOTHPAST IS DRY AND IF OIC VETTER IS

SAYING THAT C/O MCKINNEY IS A WITNESSED BY THE INTERCOM THATS A LIE

AND THE HEARING OFFICER SAID HE'S NOT GONNA ALLOW C/O MCKINNEY TO

TESTIFY AS A WITNESS AS HE WAS NOT WITH OIC VETTER AT MY CELL DOOR.

     HOWEVER, WHEN I TOLD HEARING OFFICER MARLEY THIS, HE SAID THAT

TOOTHPAST DOESNT MATTER THE GUARDS CAN STILL HEAR AND I SAID THEN LETS

DO AN EXPERIMENT, BECAUSE I KNOW WHEN I SQWEZE A BUNCH OF TOOTHPAST

IN THOSE HOLE THE TOWER GUARDS NOT GONNA BE ABLE TO HEAR ME YELLING.

BUT H/O MARLEY REFUSED TO TAKE PART IN THE EXPERIMENT THAT WOULD

PROVE OIC VETTER'S WITNESS IS LYING. I ALSO HAD PUT MY CELLIE IN

C-2/145; WADE, AND THE INTERCOM FULL OF TOOTHPAST AS WITNESSES ON MY

WITNESS SHEET, WHICH WAS NEVER RETURNED TO ME. C/O MCKINNEY WAS

ALREADY BARRED/EXCLUDED FROM TESTIFYING AS A WITNESS ▨▨ DURING

MY FIRST D.R. HEARING ON THURSDAY 6-30-2022, AND SHOULD NOT OF HAD

ANY WEIGHT IN MY CASE.        ↗HOWEVER, HEARING OFFICER MARLEY SAID

HE SPOKE TO C/O MCKINNEY EARLIER, AND HE SAID HE COULD HEAR.

6) K.A.R. 44-13-101(a)(c)(6) STATES IN RELEVENT PART, " THE INMATE

SHALL BE ENTITLED TO THE FOLLOWING:    ⟶      ⟶

                                              NEXT PAGE

( PAGE-3-OF-9 )

DAVID BROWN #57800
CASE NO. 22-05-222

( RE: DISCIPLINARY APPEAL TO SECRETARY / PAGE-4-OF-9 )

TO CONFRONT AND CROSS-EXAMINE WITNESSES AGAINST THE
INMATE" CLEARLY, BY H/O's OWN ADMISSION HE SOUGHT OUT
C/O MCKINNEY AND QUESTIONED HIM, ALLEGEDLY, BUT I WAS NOT
THERE TO HEAR, NOT THERE TO ASK MY OWN QUESTIONS AND ITS
YET ANOTHER EXAMPLE OF HEARING OFFICER MARLEY BEING BIASED
RETALIATORY, AND IGNORING THE DISCIPLINARY RULES. ▬▬

**7)** ALSO <u>K.A.R. 44-13-401(a)(c)(J)</u> STATES IN RELEVANT PART, "GENERALLY,
THE INMATE SHALL BE PERMITTED TO BE PRESENT AT ALL STAGES OF THE
HEARING" WHY HEARING OFFICER MARLEY WENT TO QUESTION C/O MCKINNEY
IS NOT KNOWN, BUT ITS CLEAR H/O ▬MARLEY▬ DID SO IN VIOLATION OF THE
D.R. HEARING PROCESS AND OUTSIDE MY PRESENCE, AND THEN DENIED ME
THE OPPORTUNITY TO QUESTION C/O MCKINNEY, AND THAT IS CLEARLY
BIASED. IT SAYS IM THE HEARING OFFICER, ILL IGNORE THE D.R.
RULES/PROCESS AND GET TESTIMONY FROM STAFF AGAINST YOU BUT
YOUR NOT ALLOWED TO QUESTION THEM OR KNOW WHATS WAS SAID

**8)** NEXT, HEARING OFFICER MARLEY SAID HE COULD CONTINUE MY HEARING
FOR UP TO (30) DAYS. THATS NOT CORRECT, A HEARING CAN BE CONTINUED "IF
ANY OF THE FOLLOWING CONDITIONS IS MET, STATED IN K.A.R. 44-13-402(b)
(1) THROUGH (6), NONE OF THE SIX CONDITIONS WERE MET, AND THERE IS
NOT JUSTIFYING WHY THIS CASE WAS POSTPONED FROM 6-3-2022 UNTIL
6-30-2022 (27) DAYS THIS CASE WAS PUT OFF, THEN I DONT GET SO MUCH AS
A HEADS UP THAT IM HAVING A HEARING AT 5:30 AM IN THE MORNING.
( SEE K.A.R. 44-13-402 IN SUPPORT )

**9)** I FIND THIS TO BE FURTHER RETALIATION DUE TO THIS PRISONER
EXERCISING HIS FIRST AMENDMENT RIGHT BY LITIGATING A PENDING
LAW SUIT CASE NO. <u>5:21-CV-03105-JAR-GEB</u> BECAUSE I TURNED
IN A MANILA ENVELOPE WITH LEGAL PAPERS I REQUESTED
BE FILED TO THE UNITED STATES DISTRICT COURT FOR
NEXT PAGE ⟶ ⟶

( PAGE-4-OF-9 )

DAVID BROWN #57800

CASE NO. 22-05-222

(RE: DISCIPLINARY, APPEAL TO SECRETARY/PAGE-5-OF-9        )

THE DISTRICT OF KANSAS, ~~DISTRICT~~ ON 6-28-2022 (TUE), FOR THE

SECOND TIME, AS I NEVER RECEIVED NOTICE OF ELECTRONIC FILING

DOCUMENT, THE MOTION IS TITLED, "INFORMING THIS COURT OF KDOC/EMPLOYEE'S

CONTINUED RETALIATION, HARASSMENT, AND INTERFERENCE WITH PRO SE

PLAINTIFFS ACCESS TO THE COURTS." AND EXHIBIT-A IN SUPPORT OF

MY MOTION, IS THE DISCIPLINARY REPORT FOR ~~THIS~~ THIS DISCIPLINARY

~~~~ REPORT ~~~~ CASE NO. 22-05-222. (SEE DOC. NO. 38 TO MY

I AM FACING NOW

LAW SUIT CASE NO. 5:21-CV-03105-JAR-GEB) MY LEGAL PAPERS WERE

E-FILED ON 6-30-2022, AND ON 6-30-2022 I WAS FOUND TO BE GUILTY

FOR SOMETHING I DIDN'T EVEN DO! ITS MORE RETALIATION.

10) FINES ARE NOT TO BE ABUSED. FINES ~~SHALL~~ BE FAIRLY AND

APPROPRIATELY USED. BEING FINED FOR SOMETHING I DIDN'T DO IS

NOT FAIR OR APPROPRIATE AND I WAS FINED EXCESSIVELY. $20.00

AND AS OF 7-4-2022 I HAVE NO MONEY BUT OWE $21.00, CLEARLY

THIS DISRUPTS FAMILY SUPPORT PAYMENTS. THIS FURTHER SHOWS

H/O MARLEY'S ANGER AND RETALIATORY ATTITUDE AGAINST ME AND

HIS DESIRE TO PUNISH ME. IN VIOLATION OF KAR 44-12-1307

AND/OR THE LAW. IM UNABLE TO GET A JOB AND SHOULD NOT BE

FINED AT ALL. THIS IS JUST ANOTHER TOOL KDOC OFFICIALS USE

TO PUNISH PRISONERS LIKE ME FOR EXERCISING MY FIRST

AMENDMENT RIGHTS. AND BECAUSE KDOC HAS ALREADY POSTED

A JUN. 30TH, 2022 $20.00 FINE ON MY ACCOUNT, IT SUPPORTS THE

~~KDOC~~ FACT THAT KDOC DOESN'T PLAN ON OVERTURNING MY D.R.

UNLESS SOME STAFF MEMBER INTERVENES AND CAUSES

(PAGE-5-OF-9)

DAVID BROWN #57800
CASE NO. 22-05-222

( RE: DISCEPLINARY APPEAL TO SECRETARY / PAGE 6-OF - 9 )

THE HIGHER RANKIN OFFICIALS TO LOOK INTO THIS CASE RATHER
THAT PUSHIN THE APPEAL THROUGH THE NORMAL RUBBER STAMP
RUBBER, CORRUPT APPEAL PROCESS.

11.) I DID NOT THREATEN ANY STAFF MEMBER DIRECTLY OR
INDERECTLY! AND THE EVIDENCE SUPPORTS THIS TRUTH.
IF ID OF THREATEND C/O STEVENSON JENIPHER M. OR
Y/O STAATS JAYSIC W, THEY WOULD OF BEEN PUT DOWN AS WITNESS
IN OIC VETTER'S D.R, AND/OR WROTE ME D.R'S THEMSELVES. AND/OR
OIC VETTER WOULD OF DOCUMENTED IT

12) ALL I DID WAS REFUSE TO STAND IN NASTY BACKED UP
SEWAGE WATER WHILE I TOOK MY SHOWER IN #6 IN C-2
CELLHOUSE. AND H/O MARLEY REFUSED TO ALLOW ME TO ASK
QUESTIONS ABOUT THE SHOWER, CLAIMING THEY DONT HAVE
ANYTHING TO DO WITH MY CHARGE, BUT THATS NOT TRUE. MY
QUESTIONS ABOUT THE SHOWER SHOW/PROVE OIC VETTER NEVER
INTENDED TO ALLOW ME TO TAKE A SHOWER, AND THE D.R. SHE
WROTE STATES SHE CAME TO C-2 CELLHOUSE TO MY CELL # 145 TO
SPEAK TO ME ABOUT A COMPLAINT ABOUT THE SHOWER. OIC VETTER
THEN STATES I WAS TOLD TO SHOWER IN SHOWER #6 OR I COULD NOT
SHOWER, AND OIC VETTER CLAIMS SHE TOLD ME SHE WOULD
INSPECT THE SHOWER TO SEE IF IT WAS IN BAD SHAPE. SO
OIC VETTR'S WHOLE D.R. IS TALKING ABOUT THE SHOWER AND H/O
MARLEY TELLING ME IT HAS NOTHING TO DO WITH MY CHARGE
IS CORRUPT, INCORRECT, ZEASED, AND AN ATTEMPT TO
PROTECT OIC VETTER ILLEGAL RETACIARISTY ACTIONS/BEHAVIEN

( PAGE-6-OF-9 )          ⟹ NEXT PAGE ⟶

DAVID BROWN #57800
CASE NO. 22-05-222

( RE: DISCIPLINARY APPEAL TO SECRETARY / PAGE-7-OF-9 )

AND CFES, BECAUSE OIC VETTER NEVER INTENDED TO INSPECT
THE SHOWER TO SEE IF IT WAS IN BAD SHAPE, AS OIC VETTER
COMES TO MY CELL WITH A GRIEVANCE IN HER HAND AND
PUTS IT IN MY CELL DOOR AND TELLS ME TO FILE A GRIEVANCE
AND SHE'LL FILE A WORK ORDER BUT IM NOT GETTING A
SHOWER, BEFORE I EVEN HAD A CHANCE TO EXPLAIN THE
SITUATION, AND BEFORE SHE LOOKED AT THE SHOWER, AND
SHE NEVER INSPECTED THE SHOWER AND LEFT THE CELLHOUSE
AS IT WAS ESTABLISHED DURING MY FIRST D.R. HEARING
ON 6-3-2022 BY THE HEARING OFFICER, AND THIS SHOWS
OIC VETTER LIED IN HER D.R. AND ONLY SAYS WHAT SHE SAYS
ABOUT THE SHOWERS IN AN ATTEMPT TO COVER HER ~~REATRATAN~~
EVIG BIASED, COMMIT RETALIATORY DECISION AND DENY ME A
SHOWER. ~~REATRATALT~~ THE WHOLE D.R. IS WROTE IN AN
ATTEMPT TO COVER OIC VETTER, C/O STAAB, AND C/O STEVENSONS
WRONG DOING, E.G. DEMANDING I STAND IN BACKED UP STINKY SEWAGE
WATER WITH CUM / SPIT FLOATING IN THE POND, AND
PUBLIC HAIR, ETC, AND BECAUSE I REFUSED TO I WAS DENIED
A SHOWER ALTOGETHER.

13) IVE CHANGED, AND IM NOT GONNA THREATEN STAFF. AND
AND I DIDNT ON 5-31-2022. THIS D.R. FOR THREATING WILL
CAUSE ME TO BE MAX CUSTODY FOR (3) YEARS, IT CAUSED ME TO BE
KICKED OUT OF THE STEP DOWN PROGRAM, IT CAUSED ME STRESS,
DEPRESSION AND IT COST ME $20.00. IT ALSO IS THE CAUSE
OF MY BACK INJURY INDIRECTLY, ALL MY DISCIPLINARY →

( PAGE-7-OF-9 )

DAVID BROWN #57800
CASE NO. 22-05-222

( RE: DISCREDINARY APPEAL TO SECRETARY/PAGE-8-OF- 9 )

RIGHTS WERE VIOLATED, I DIDN'T SAY I COULD SPIT ON STAFF
OR HEADBUTT THEM, I SAID I DIDN'T SPIT ON STAFF, KICK STAFF,
HEADBUTT STAFF, THROW SPIT ON STAFF, CUSS STAFF OUT OR
THREATEN STAFF, I DIDN'T DO ANYTHING TO JUSTIFY NOT GETTING
A SHOWER, I WANT MY SHOWER...." THAT'S WHAT I SAID. PERIOD.!!

THIS D.R. NEEDS TO BE OVERTURNED AND DISMISSED BECAUSE I
DIDN'T THREATEN ANYONE AND MY NUMEROUS DUE PROCESS RIGHTS
AND/OR D.R. HEARING RULES, REGULATIONS, POLICIES WERE IGNORED

AND/OR VIOLATED AND THE STANDARD OF PROOF WAS NOT MET.

AS IT'S MORE LIKELY NOT TRUE ~~~~~~ THAT I THREATEN ANYONE
DIRECTLY OR INDIRECTLY. AND STILL WHEN I'M FOUND GUILTY OF
A RULE I DID NOT BREAK, I'M CALM AND COLLECT, AND DIDN'T CUSS
ANYONE OUT OR THREATEN ANYONE, OR SPIT ON ANYONE. I'M PRETTY MUCH
A ROLE MODEL INMATE, AND I'M GOING TO CONTINUE TO FIGHT THE EVIL
CORRUPT, ILLEGAL, RETALIATORY STAFF WITH A PEN AND PAPER.
OIC VETTER IS STILL UPSET AND RETALIATING AGAINST ME FROM YEARS
AGO WHEN I EXPOSED HE TAKEN PART IN ALLOWED AN INMATE TO
MASTURBATE WHILE SHE WATCHED HIM. AND I'M NOT LYING OR
BEING DISRESPECTFUL. I'M STATING THE FACTS, TELLING THE TRUTH,
EXPLAINING WHY OIC VETTER IS LYING ON ME AND WRITING ME
RETALIATORY DISCIPLINARY REPORTS. SHE NEEDS TO STOP!

14) IT'S MORE LIKELY THAT IF I WAS GOING TO THREATEN
SOMEONE I'D OF THREATENED THE STAFF FOR DENYING ME A SHOWER

( PAGE-8-OF- 9 )              NEXT PAGE →

DAVID BROWN #57800
CASE NO. 22-05-222

(RE: DISCIPLINARY APPEAL TO SECRETARY / PAGE-9-OF-9)

FOR NOT STANDING IN SEWAGE WATER, AND THEN THE OIC THAT DENIED ME
A SHOWER FOR NO OTHER REASON THAN BECAUSE SHE'S THE OIC IN CHARGE
AND HER DECISION WAS TO DENY ME A SHOWER, AND I DID NOTHING WRONG!
SHE'S RETALIATING AGAINST ME PEAN AND SIMPLE: THATS ALL THIS IS, AND
THE DR. SHOULD BE DISMISSED!

David Brown #57800 /B-1/12/EDCF

I, CHRISTOPHER DAVID BROWN BEING COMPETENT TO MAKE
THIS DECLARATION AND HAVING PERSONAL KNOWLEDGE OF THE MATTERS
STATED HEREIN, DECLARE PURSUANT TO 28 U.S.C. §1746, UNDER
PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT

EXECUTED  7-5-2022     AT EDCF/13-1/#122
               DATE                        LOCATION

Christopher David Brown
          SIGNATURE

AFTER RECEIVING HEARING OFFICER MARLEY'S
HEARING TESTIMONY I ADD TO MY APPEAL WITH THE
FOLLOWING INFORMATION/PAGES.

(10,11, AND 12)

(PAGE 9-OF-X) (PAGE 9-OF-9) PAGE ADDED →

DAVID BROWN #57800
CASE NO 22-05-222

1.) HEARING OFFICER MARLEY HAS FAILED/REFUSED TO DO HIS JOB HONESTLY AND CORRECTLY.

2) H/O MARLEY OUT RIGHT LIES, AND FABRICATE THE TESTIMONY RECORD.

3.) NUMBER ONE H/O MARLEY DOES NOT DOCUMENT THE FACT THAT HE ARGUED WITH ME CLAIMING I SAID I THREATEND STAFF, AND THAT I TOLD HIM I WANTED THE PHONE RECORD SUBPOENAED AND H/O MARLEY SAYING I DONT HAVE THE SAME RIGHTS IN CRIMINAL COURT AS IN A D.R. HEARING AND I CANT SUBPOENA THE PHONE RECORDS OF MY FIRST HEARING, AND THAT H/O MARLEY SAID HE'S GOT H/O OSBORNS/GALLOWAYS HEARING RECORD AND PULL IT OUT, READS IT, AND SEES I'M RIGHT, AND HE WAS WRONG AND HIM BECOMING VERY UPSET.

4.) NUMBER TWO, H/O MARLEY CLAIMS HE READS REPORT INTO RECORD, REVIEWS SUMMONS, TIME LIMITS OF RECEIPT, AND WITNESS LIST, AND ALL OF WHICH ARE IN ORDER TO PROCEED WITH THE HEARING. LIAR! I NEVER GOT A SECOND SUMMONS, AND I TOLD H/O MARLEY THAT AND HE STARTED TELLING ME I GOT THE FIRST ONE AND THAT'S ALL I'M REQUIRED TO GET. WHICH IS A LIE AS THE RULE BOOK CLEARLY STATES AN I'M IS TO GET NOTICE OF A HEARING AT LEAST WITHIN 24 HOURS OF THE HEARING AND THIS DID NOT HAPPEN. KAR. 44-13-101 WAS VIOLATED AND BEING LYING H/O MARLEY ATTEMPTS TO RID THE RECORD WITH OF SUCH FACT.

5.) H/O MARLEY AGAIN LIES IN THAT HE CLAIMS I PRESENTED NO WRITTEN OR VERBAL MOTIONS, AND I DID. I OBJECTED TO THE HEARING VERBALLY BECAUSE I DIDN'T GET NOTICE OF THE HEARING VERBALLY OR BY SUMMONS, AND THAT ITS BEEN AROUND 27 DAYS SINCE I HAD MY FIRST HEARING AND NONE CONTINUED THIS HEARING OR NOTIFIED ME AS TO WHAT WAS GOING ON, AND H/O MARLEY WAS SAYING HE CAN CONTINUE THE HEARING FOR 30 DAYS. AND HE DOESN'T DOCUMENT ANY OF THIS IN THE RECORD BECAUSE HE'S A LIAR AND WAS LYING TO ME TRYING TO PROVOKE ME INTO CUSSING HIM OUT BUT I DID NOT.

NEXT PAGE →

DAVID BROWN #57800

CASE NO- 22-05-222

6.) H/o MARLEY HAS DENIED/REFUSED ME THE RECORD OF THE FIRST HEARING BY PHONE ON 6-3-2022, AND DOES NOT MENTION IT IN HIS HEARING RECORD.

7.) H/o MARLEY REFUSED ME WITNESSES, NOT JUST STAATS AND STEVENSON, BUT ALSO C/o McKINNEY, AND OF COURSE H/o MARLEY DOESNT DOCUMENT C/o McKINNEY, WHO I HAD A RIGHT TO QUESTION AS HE CLAIMS HE HEARD ME SAY SOMETHING, THROUGH AN INTERCOM FULL OF TOOTHPASTE THAT HAD DRIED AND SEALED IT CLOSE. BUT H/o MARLEY SAYS HE QUESTIONED C/o McKINNEY OUTSIDE MY PRESENCE, WHICH IS PROBABLY ANOTHER LIE, EVEN SO I SHOULD HAD BEEN ABLE TO QUESTION HIM AND WAS DENIED.

8.) H/o MARLEY DOES NOT DOCUMENT THE FACTS/WORDS/QUESTION TRUTHFULLY, OR CORRECTLY. I ASKE OFC VETTER, "DID I THREATEN YOU?" OFC VETTER SAID "YES" I ALSO ASK OFC VETTER, "IF C/o STAAB OR C/o STEVENSON TOLD HER I THREATENED THEM?" AND OFC VETTER SAID, "YES" AND THATS ANOTHER LIE, AS I DIDNT THREATEN EITHER STAATS OR STEVENSON AND WHEN OFC VETTER SAID THEY TOLD HER I DID I HAD A RIGHT TO QUESTION THOSE OFFICERS, BUT H/o MARLEY WOULDNT ALLOW ME TO BECAUSE HE KNOWS OFC VETTERS A LIAR TOO AND JUST LIED, AND I COULD PROVE IT BY QUESTING THOSE TWO GUARDS.

9.) H/o MARLEY DOESNT DOCUMENT ANYTHING ABOUT HOW HE SAID IT DOESNT MATTER IF I HAD TOOTHPASTE IN THE INTERCOM OR NOT BECAUSE THE TOWER OFFICER CAN STILL HEAR, AND I SAID I WANTED TO DO AN EXPEREMENT AND TOLD THEM TO HAVE THE TOWER GUARD TELL US WHAT I SAY TO YOU WHEN IM TALKING TO YOU AT THE CELL DOOR, BUT H/o REFUSED TO MAKE PART IN THAT, WHICH WOULD AGAIN PROVE STAFF/C/o McKINNEY LIED ON ME, AND HE DID NOT HEAR ME SAY ANYTHING, BUT THE BENTED

(PAGE-11-OF-12)

DAVID BROWN #57800
CASE NO- 22-05-222
H/O WOULDN'T WANT THAT.

10.) SOMETHING ELSE, I TOLD H/O MARLEY I DIDN'T CUSS ANY OF THOSE GUARDS OUT, OR THREATEN THEM. IF YOU LOOK AT MY RECORD YOU'LL SEE I HAD $21000 EN D.R. FENES, CUSSED STAFF OUT, THREATEND THEM AND BATTERED THEM. BUT THAT'S NOT ME NO MORE. I'M NOT CUSSING STAFF OUT OR THREATENING THEM. I PICK UP A PEN AND PAPER AND WRITE FORM-9/GRIEVANCE NOW... AND GUESS WHAT?, H/O MARLEY DID NOT WRITE ME A DISCIPLINARY REPORT FOR THREATENING, WHICH SUPPORTS THIS D.R. WAS RETALIATORY AND DONE TO PUNISH ME FOR EXERCEISING MY FIRST AMENDMENT RIGHTS, e.g. LITIGATING MY LAW SUIT, WRITING FORM-9'S, GRIEVANCES, AND APPEALS.

11.) AND LOOKING AT MY D.R. HISTORY, I HAVEN'T BEEN GETTING D.R.'S AND THE ONES I'VE GOTTEN I HAVE BEEN RETALIATORY AND LATTER DISMISSED. AS THIS ONE SHOULD BE DISMISSED. BUT THE SANCTION H/O MARLEY GAVE ME ARE EXTREME. I'M IN ADSEG LOCK DOWN/DON'T HAVE A JOB, AND GET 20.00 FINE, FOR SOMETHING I DIDN'T EVEN DO, AND 30 DAYS RESTRICTION AND 7 DAYS DIS SEG, AND (3) YEARS MAXIMUM CUSTODY, AND LEVEL ONE, NO VISITS, AND, A D.R. THE KS REVIEW REVIEW BOARD CAN USE TO PASS ME AND DENY ME PAROLE AGAIN. AND I'VE BEEN A ROLEMODEL PRISONER AND GET ALL THESE SANCTIONS AND EXTREME PUNISHMENTS FOR STAFF LYING ON ME, FOR STAFF RETALIATION, FOR NOT STANDING IN BACKED UP SEWAGE WATER.

12.) FOR THE 12 PAGES OF REASON/FACTS MY D.R. GUILTY FINDING SHOULD BE OVER TURNED AND DISMISSED, AND STAFF INSTRUCTED TO STOP RETALIATING AGAINST ME.

David Brown #57800
EXECUTED ON 7-7-2027

( PAGE - 12 - OF - 12 )

resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility." I have been on holdover status for 800 days. (See exhibit D for KDOC policy)

II Arguments

I have no access to the law library other than requesting things by memory. I submit the following argument based on common sense. The facts I have set forth to the Court show that I am suffering from a deadly blood clot and that KDOC is in violation of it's own policy. Issuing a protective order for an immediate transfer to a facility I can be housed in General Population is all I ask of the Court and that is me asking the Court to have KDOC follow it's own policy. There is clear merit to this case based on previously established law and there is clear merit to this protective order. I also ask the Court to order KDOC to not retaliate by moving a dangerous inmate into my empty bunk in my cell from any gang I have had issues with or affiliates.

Respectfully Submitted By,

Nicholas Cox 98253
P.o. Box 311
El Dorado, KS 67042

2

Exhibit A
(3pgs)

3

Mr. Kenneth D. Leek #63523
E.D.C.F. 1737 S.E. U.S. Hwy. 54
El Dorado, KS 67042-0311


IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS


NICHOLAS COX,                    )
        Plaintiff,               )
                                 )
    Vs.                          )    Case No. 22-CV-3154
                                 )
JEFF ZMUDA, et al,               )
        Defendants.              )


DECLARATION OF KENNETH D. LEEK


KENNETH D. LEEK states:

1. Declarant and plaintiff are neighbors in long-term administrative segregation.

2. Declarant is a jailhouse lawyer that has served more than 10 years in segregation over the last 27 years.

3. Declarant and plaintiff have spent hours discussing his health, KDOC and prison politics, and the administration at E.D.C.F.

4. Declarant has learned plaintiff has a history of blood clots and has received treatment for them on multiple occasions.

5. Recently declarant was screaming and yelling at correctional staff because plaintiff was in extreme pain due to a blood clot in his leg and the officers were acting as it was no big deal. He ended up being taken to the hospital.

6. E.D.C.F. is on extremely limited movement status due to a massive staff shortage that has lasted for a few years. As a result, prisoners have went without yard at all for over a year, one day a week for a few months, and now

two days a week if staff levels permit.

7. One day recreation is held in a tiny room never intended for it, and the other is held in the yard 'cages' outside. In either case yard only lasts for one hour.

8. Five days a week a segregation prisoner is locked in his cell, 24 hours a day, with his cellmate, which causes a lot of tension.

9. Prison policy mandates segregated prisoners receive a minimum of three (3) hours a day out of their cell, which does not happen.

10. The KDOC is massively overcrowded. In the last five years almost every prison has double-bunked their cells, including in segregation units. Even with such extreme action the prisons still struggle to have enough bed space for day-to-day operations.

11. The KDOC, especially the EDCF administration, has a custom of using segregation improperly as a form of bed management. A prisoner that should simply should be transferred to another prison as a result of some incident routinely finds himself on Other Security Risk (OSR) status for 2-3 years; so called gang members get in a fist fight and end up on OSR status for a year or more when the disciplinary sentence is only 15 days.

12. There are so many prisoners in long-term segregation if they were to be properly released there wouldn't be enough general population beds to house them. Prisoners doing 15 day sentences often have to wait an extra week or two to be released due to a shortage of bed space.

13. EDCF also has a custom of forcing prisoners into a lose-lose catch 22.; rot in segregation forever or go into general population where you know you'll be assaulted (if you haven't been already). Declarant was interviewed by EDCF staff and asked if he wanted to be in population there. He stated he did not but was basically told his input did not matter, he would be in EOCF population.

14. The KDOC has its share of responsibility in unlawful customs. Unlike other prisons EDCF has to reach out to other prisons and ask them to accept the transfer of a prisoner. Other prisons

(2)

by contrast use EDCF as a dumping ground for any undesirable prisoner. They transfer whoever they want to EDCF and they cannot refuse to take them. The prisoners are caught in the middle.

15. The KDOC has a policy that supposedly allows a prisoner to request an out of state transfer during their review period. Declarant and many others have requested such a transfer on multiple occasions and the unit teams won't even process the request. If the KDOC wants you gone, however, you'll be gone in an instant.

16. To keep prisoners docile and quiet the KDOC and/or EDCF staff will tell them and/or their family members they are working on an interstate compact agreement. The truth of the matter is nothing is being done and the prisoner will continue to rot in segregation.

17. In Kansas state prisons the assaults and murders that happen all the time in max do not happen at the medium facilities. The KDOC has the ability to give any prisoner medium custody by exception in order to avoid assaults. If you're an informant you can receive such favor with ease. If you're trying not to be assaulted you can just rot in segregation.

18. Declarant has personal knowledge of plaintiff's situation and does not believe he should be housed in any max custody prison in the KDOC.

Submitted By:
Kenneth D. Leek
KENNETH D. LEEK

VERIFICATION

Pursuant to 28 U.S.C. §1746, the undersigned declares under the penalty of perjury that he is the declarant and the above is true and correct.

8/5/22

Kenneth D. Leek
KENNETH D. LEEK

(3)

Exhibit B
(2 pgs.)

4

# Health Services Request Form

| For Medical Use Only |
| --- |
| Sólo para uso médico |

| Date Received: | 7/25/99 |
| --- | --- |
| Time Received: | 8/00 |

Print Name (Imprimir nombre): Nicholas Cox

Date of Request: 7/25/22

ID #: 94393   Date of Birth (Fecha de nacimiento): 11/3/91

Housing Location (Ubicación de la vivienda): B1 264

Nature of problem or request (Naturaleza del problema o solicitud): The blood class are getting worse. Also one is on my hip now. Calf, Thighs, and Hip.

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuerdo en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuerdo con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este articulo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

| (The area below is not to be used for education, counseling or documenting a clinical encounter) |
| --- |

Triaged by: 4/5/RK   ☑ Routine   ☐ Urgent   ☐ Emergent

Date: 7/25/22   Time: _____

Date of Face-to-Face Visit: _____

Other: 7/25/22

### Response Recommendation (to be completed by Medical Staff only)

Initial Appointment
| | | | | | |
| --- | --- | --- | --- | --- | --- |
| ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
| ☑ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |

Fee Charge  ☐ $2.00   Follow up

Comments: Previous Rx Xarelto was 15 mg then bumped 20 mg which is current dose

7/25/22

| Staff Signature | Date |
| --- | --- |

*handwritten notes in margins:*
Sat every ① transport HD
9/18 - biopsy

Sunday noticed 5/11/blood

Once unable to locate

wants higher dose of Xarelto thats what happened last time

235
968
124/86
71
978

*lab will be drawn this week every AM

*no plans available for continued maintenance

# Health Services Request Form

| For Medical Use Only<br>Sólo para uso médico | |
|---|---|
| Date Received: | 7/22/22 |
| Time Received: | 255pm |

Print Name (Imprimir nombre): _Nicholas Fox_

Date of Request: _7/11/22_

ID #: _96053_          Date of Birth (Fecha de nacimiento): _12/3/93_

Housing Location (Ubicación de la vivienda): _A1 164_

Nature of problem or request (Naturaleza del problema o solicitud): _My blood clot is getting worse it's all the way to my thigh now and is heading. My vein is bruised enough to do another blood draw. Please don't mess this one up and get all you need this time. thanks_

I consent to be treated by health staff for the condition described.
(Da su consentimiento para ser tratada por el personal de salud para la condición descrita.)

I understand that my requesting health services does not necessarily mean that I agree that I should be assessed a charge for healthcare services. If I disagree with any charges assessed, I understand I may file a grievance with the Warden as per KAR 44-15-101 et seq. I understand that a $2.00 fee will be assessed for any sick call visit and any non-emergency visit to health care staff if it is not a follow-up visit or referral.

(Entiendo que mi solicitud respect de recibir servicios de salud no necesariamente inplica que estoy de acuero en que se me cobren cargos por dichos servicios de salud. Comprendo que, en caso de no estar de acuero con el cobro de algún cargo, puedo presentar un reclamo ante el Alcalde, de conformidad con las reglamentaciones del KAR 44-15-101 et seq. Tengo entendido que el personal de salud cobrará un arancel de $2.00, por cualquier visita a un enfermo o visita que no sea de ugencia, si no se trata de una visita de seguimiento o por una derivación.)

Patient Signature (Paciente Firma)

**Place the slip in medical request box or designated area.**
**(Pon este articulo en la caja médica u otra área designada.)**
**Do not write below this area. (No escribe debajo de esta área.)**

(Original – Medical Record, Yellow Copy – Inmate/Patient, Pink Copy – Business Office)

(The area below is not to be used for education, counseling or documenting a clinical encounter)

Triaged by: _Greenlee LPN_          ☑ Routine  ☐ Urgent  ☐ Emergent

Date: _7/22/22_          Time: _355 pm_

Date of Face-to-Face Visit: _7/22/22   355_

Other:

Response Recommendation (to be completed by Medical Staff only)

| Initial | ☐ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |
|---|---|---|---|---|---|---|
| Appointment | ☑ Nurse | ☐ Doctor | ☐ Dentist | ☐ Eye Doctor | ☐ Mental Health | ☐ ARNP |

Fee Charge ☐ $2.00   _F U_

Comments: _Monitor blood clot area, s/s to note shortness of breath/bruise/discolor @ clot site/↑ in tenderness / increased_

Staff Signature _Neill LPN_          Date _7/22/22_

_261_
_983_
_138/88_
_89_
_96_

Centurion: REC-013KS
07/01/2020



centurion

_(handwritten left margin:) roof pain as I walk, hip pain when I do/a lot like or I tend to/put pain in a area will aches occasional sharp numbness on surface of skin_

Exhibit C

(1 pg)

5

## Kansas
Department of Corrections

### INTERNAL MANAGEMENT POLICY & PROCEDURE

Applicability: X ADULT Operations Only _ JUVENILE Operations Only _ DEPARTMENT-WIDE

IMPP # 20-101A                                                                 PAGE # : 1 of 5

SEGREGATION/RESTRICTIVE HOUSING: Minimum Standards for the Operation of Restrictive Housing Units

Original Date Issued: 3-10-21    Replaces IMPP Issued: 04-09-21   CURRENT EFFECTIVE DATE: 02-02-22

Approved By: _____, Secretary    Next Scheduled Review: 10/2024

### POLICY

To ensure the humane and effective treatment of special management residents, minimum standards are established with regard to the operation and maintenance of restrictive housing units. Additionally, minimum standards are to apply to the manner in which residents are fed, clothed, housed, and dealt with on a daily basis. The provisions of this IMPP are to apply to disciplinary and administrative restrictive housing alike. Privileges are to be consistent with available resources based on the security needs of the unit.

### DEFINITIONS

None.

### PROCEDURES

I.  **Diet and General Housing Considerations**

    A.  Each resident is to receive the same quality and portions of food daily, including selective and medical diets, with at least 2,800 calories of food from the normal diet of residents not in restrictive housing.

        1.  The noon meal provided to residents in restrictive housing may consist of the approved sack lunch as established in the department-wide standardized menu and approved by the licensed dietician to meet the daily caloric requirements.

    B.  Each cell in which a resident is confined in restrictive housing is to, whenever possible, be at least as large as other cells in the facility and is to be adequately lighted during the daylight hours.

        1.  All the necessities of civilized existence, including toilet, bedding and water for drinking and washing is to be provided.

            a.  If any of these necessities are removed temporarily, that removal is to be only to prevent suicide or self-destructive acts, or damage to the cell and its equipment, or to other persons.

        2.  Each resident is to have the opportunity to shave and shower at least three (3) times per week, with one shower being required, unless this would present a clear security hazard as determined by the Warden or designee.

        3.  Barbering services may be sought every 30 days.

---

    4.  The procedure for issue and exchange of clothing, bedding, and linen is to be as frequent and of the same quality as for the general population unless an exception is found necessary by the senior officer on duty.

        a.  Such an exception is to be recorded in the RH electronic log and justified in writing.

    C.  All residents in restrictive housing are to be provided clothing that is standard facility, and access to basic personal items for use in their cells, unless there is imminent danger that a resident may become destructive or self-injurious.

        1.  Residents confined in restrictive housing are not to be deprived of normal body clothing except for the resident's own protection.

            a.  If such a deprivation is temporarily necessary, the resident is to be provided with body clothing and bedding adequate to protect the resident's health, depending on air temperature and other conditions in the cell.

            b.  This does not preclude search protocol upon admission.

        2.  Residents on disciplinary or long-term restrictive housing status are to be issued coveralls or scrubs.

    D.  Residents are to have freedom to talk with other residents on the respective unit or tier, from within cells, in recreation areas, and while being moved within the restrictive housing unit, providing such communication is productive and does not delay unit maneuvers.

    E.  Residents are to be allowed to clean their cell and windows with mop, toilet brush, cloth, and appropriate disinfectant every seven (7) days. The cell may be cleaned more often if a resident is moved to/from the cell.

II.  **Availability of Legal Counsel and Access to Medical Care**

    A.  A resident's right to communicate with an attorney or a person or agency designated to receive complaints is not to be interfered with, including access to virtual court appearances as mandated by order to appear.

        1.  Attorney visits may take place in the appropriate visiting area, as scheduled by the attorney with the facility Warden or designee.

    B.  No resident is to be kept in restrictive housing, for any reason, for longer than 24 hours without being examined by a medical doctor, or other medical personnel under the doctor's supervision.

        1.  The resident is to be observed once a week thereafter and examined if deemed necessary.

        2.  Any medication prescribed for a resident must be provided for that resident.

    C.  Residents are to have access to the health care system while on restrictive housing status, to include the right to receive prescribed medication.

        1.  Checks by qualified health care staff must occur to ensure that the residents have an opportunity to request care for medical, dental, or behavioral health needs.

        2.  Health care staff is to make daily rounds while residents are confined to restrictive housing units and behavioral health care professionals is to make rounds at least weekly. All healthcare rounds are to be documented.

        3.  The presence of health care staff in restrictive housing is announced and recorded.

        4.  In addition to the health rounds, arrangements must be made for triage, examinations, and

---



    5.  treatment in an appropriate clinical setting when a resident requests health care.

        Restrictive housing practices are not to adversely affect a resident's health. Health care staff is to promptly identify and inform security staff if a resident's medical or behavioral health is in jeopardy or deteriorating.

III.  **Mail, Visitation, Access to Telephones, Availability of Legal and Reading Materials, and Opportunities to Exercise**

    A.  Each resident in restrictive housing is to be provided with the same opportunities for writing and receiving letters as provided to the general population unless this would present a clear security hazard as determined by the Warden/superintendent or designee.

    B.  Residents may request one (1) visit after their first seven (7) days in short-term restrictive housing by submitting their request to the Unit Team Manager via form 9.

        1.  Residents classified as PI or PHD status are not eligible to receive visits.

        2.  Residents classified as Long-Term Restrictive Housing Status are limited to video visitation only.

        3.  If possible, the resident is to be given an opportunity to notify visitors of any restrictions before the visitors arrive.

    C.  With the exception of residents classified as Pending Results of an Investigation (PI), residents in short-term restrictive housing may receive one (1) opportunity to place a completed telephone call up to 20 minutes in length every seven days.

        1.  Investigation staff may ask the facility Warden to make an exception to a resident's telephone call privilege based on the need to maintain the integrity of an investigation.

    D.  Each restrictive housing resident is to have access to legal materials.

    E.  Each restrictive housing resident is to have access to reading materials.

    F.  Each resident confined in disciplinary or administrative restrictive housing is to be allowed to exercise outside the cell, if desired, for at least one (1) hour per day and at least five (5) days per week unless circumstances such as an emergency or extreme weather make such exercise periods impractical or dangerous.

        1.  Any cancellation of exercise periods are to be documented in the unit log noting authorization by the Chief of Security.

        2.  The facility Warden, or designee, may approve that a resident remain in restraints during exercise if the resident's behavior puts staff or others at risk of bodily harm.

        3.  Except as provided herein, weather permitting, restrictive housing residents are to be permitted to exercise outdoors, for four (4) of the five (5) days, to the extent that facilities and staff are available to maintain basic security for those residents.

            a.  Exercise on the indoor day is to be provided in an area outside the resident's own cell.

        4  When limitations on normal exercise are necessary, alternatives are to be explored to provide adequate exercise to maintain health.

        5.  A resident may be required to remain in the cell and be allowed, at the resident's own discretion, to exercise in the cell if:

---

        a.  A substantial security risk for the resident is documented; and,

        b.  A set of exercises is approved for the resident, by a doctor or physical fitness professional, as being adequate for the maintenance of health and capable of being accomplished within the physical limitations imposed by the cell interior.

        c.  If while in restrictive housing status a resident has threatened or battered staff or has possessed dangerous contraband, the resident's out of cell exercise may be suspended for up to 30 days provided that a set of exercises pursuant to subsection III.F.5. b. have been identified.

        d.  In-cell exercise information is to be provided as applicable to resident's not permitted to participate in outside recreational activity.

    G.  Property is limited to only that allowed in Attachment J of IMPP 12-120A.

        1.  As an incentive of program participation, wardens may approve limited increases in property allowance of food items in a general order.

        2.  If a resident is transferred to another facility, property is to be reduced back down to the IMPP allowance.

IV.  **Access to Programs and Services and Staff Visits to Restrictive Housing Units**

    A.  Administrative restrictive housing residents must have reasonable access to programs and services including, but not limited to, educational services, commissary services, library services, social services, counseling services and religious guidance.

        1.  Residents are to be allowed to practice religious beliefs in accordance with IMPP 10-110D Religious Programs.

    B.  The unit manager of a restrictive housing unit or the unit manager's designee is to make daily rounds in the restrictive housing unit to each cell. In the absence of the unit manager and/or his/her designee, the shift supervisor or the supervisor's designee must make those daily rounds.

    C.  In addition to the daily rounds specified in Section II. E. above, a qualified heath care professional must visit the restrictive housing unit at least once per day, unless more frequent medical attention is needed. For purposes here, routine visits by qualified health care staff to administer or distribute medication must minimally satisfy this requirement.

    D.  Restrictive housing residents are allowed to receive visits from members of the program staff on reasonable request.

    E.  A shift captain or designee is to visit each cell of the unit during each shift.

    F.  Log entries, as set out within the provisions of Section V. of this IMPP, must document all visits to a restrictive housing unit.

V.  **Documentation of Service Delivery and Visits to Restrictive Housing Units**

    A.  A permanent log in a bound book (may be electronic) is to be maintained at or near the restrictive housing cells, and employees in charge of these cells are responsible for recording all admissions, releases, indicators of health and medical condition, clothing and bedding restrictions, food intake, visits to cells and other events, including those of a routine nature.

    B.  A monthly report is to be made to the Secretary of Corrections giving the following data for restrictive housing residents:

        1.  Name of resident;

2. Race or ethnic origin;

3. Type of, and reason for, restrictive housing;

4. Length of time in restrictive housing; and

5. Health and medical condition.

C. If the resident is deprived of any usually authorized item or activity, a report of this action is to be made for the resident's file and forwarded to the Warden/Superintendent or the deputy in charge of Security.

1. This report is to be in addition to the notation in the log required by procedure V.A. of this IMPP.

VI. Disciplinary Procedures

A. All applicable provisions and requirements of the disciplinary procedure set forth within K.A.R. 44-13-101 *et. seq.* are to apply to residents housed in a restrictive housing unit.

NOTE: The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of this document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS**

| Name/Type of Report | By Whom/To Whom | Due |
|---|---|---|
| Monthly Restrictive Housing Report | Warden/Secretary of Corrections | Monthly |

**REFERENCES**

KAR 44-13-101, *et seq.*
IMPP 12-120A, 20-104A

**HISTORY**

03-10-21 Original
04-09-21 Revision 1
02-02-22 Revision 2

**ATTACHMENTS**

None.

Exhibit D

6

**Kansas**
Department of Corrections

**INTERNAL MANAGEMENT POLICY & PROCEDURE**

Applicability:  _X_ ADULT Operations Only  __ JUVENILE Operations Only  __ DEPARTMENT-WIDE

| | |
|---|---|
| **IMPP #: 20-104A** | **PAGE #: 1 of 6** |

SEGREGATION/RESTRICTIVE HOUSING: Purpose of Administrative Restrictive Housing and Appropriate Placements

**Original Date Issued:** 10-11-21   **Replaces IMPP Issued:** 10-11-21   **CURRENT EFFECTIVE DATE:** 05-13-22

**Approved By:** _[signature]_ , Secretary   **Next Scheduled Review:** 06/2024

**POLICY**

The inability to isolate disruptive, violent and/or residents capable of influencing violence and disruption in a prison environment compromises the safety of both residents and staff. Administrative restrictive housing procedures are to be established for the control of residents necessary for purposes other than punishment. Residents are to be housed in the general population at the lowest appropriate custody level unless circumstances or resident behavior dictate otherwise. Only residents who require restrictive housing are to be assigned there. Procedures are to be effectively related to the control of the resident for stated purposes. These procedures may be increased in scope and extent as necessary to maintain effective control. When the need to isolate a resident in restrictive housing no longer exists, the resident is to be returned to the general population.

**DEFINITIONS**

**Restrictive Housing:** A generic term used to describe housing which separates residents from the general population for both administrative and disciplinary purposes.

**Administrative Restrictive Housing:** A form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents; or when a resident's continued presence threatens the secure and orderly operation of the facility.

**Disciplinary Restrictive Housing:** A form of restrictive housing to which a resident can be sentenced following conviction of a rule violation through disciplinary proceedings.

**Short-Term Administrative Restrictive Housing:** Restrictive housing placement less than 15 days. For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Disciplinary Restrictive Housing
- Pending Results of an Investigation (PI)
- To prevent further collaboration, intimidation, or disruption
- Pre-Hearing Detention (PHD)
- Communicable Disease
- Critical Monitoring
- Emergency Situations
- Hold Overs
- Refusing to participate in identification procedures

**Long-Term Administrative Restrictive Housing:** Restrictive housing placement for 15 or more continuous days which requires comprehensive and individualized planning and services to aid in the return of the resident into the general

---

population setting. For purposes of accounting days, the date of admission to restrictive housing is considered day one (1). Classification categories include:

- Protective Custody (PC) refer to IMPP 20-108D [Protective Custody]
- Consistent Bad Behavior (CBB)
- Other Security Risk (OSR)
- Capital Punishment

**Long-Term Restrictive Housing Committee:** A committee comprised of the sending facility Warden, KDOC Risk Manager, KDOC Classification Manager, Enforcement, Apprehension, and Investigations (EAI) Director or designee, and the KDOC Deputy Secretary of Facility Management.

**Severe and Persistent Mental Illness (SPMI):** A mental health illness that is prolonged and recurrent, impairs activities of daily living and requires long-term treatment.

**Single Event:** A situation or instance involving a single or series of related actions or behaviors defining a single incident.

**PROCEDURES**

I.  **General Procedures**

A.  Residents may be confined in administrative restrictive housing for any of the reasons or conditions articulated within this policy.

1.  Any resident may be held in administrative restrictive housing under any subsection or combination of subsections of this policy simultaneously.

a.  If the resident is held under more than one (1) subsection, that fact is to be stated in the administrative restrictive housing report in accordance with IMPP 20-105A.

B.  Residents with disabilities must be placed in cells that accommodate their disability.

1.  Residents must not be placed in restrictive housing solely due to their disability or due to the lack of available accessible cells.

C.  Juveniles, pregnant women or women who recently gave birth, and residents with a severe and persistent mental illness (SPMI) must be considered for alternative placement in the infirmary, a mental health unit or in a unit on a suicide watch or crisis level placement.

1.  Residents considered to be severely and persistently mentally ill for the purpose of this policy are to be assessed for placement in restrictive housing pursuant to short-term restrictive housing categories only.

II.  **Guidelines for Use of Short-Term Administrative Restrictive Housing**

A.  The time a resident may be placed in any combination of short-term restrictive housing classifications must not exceed 15 days based on a single event. The Warden/Deputy Secretary of Facility Management must approve any placement considered to be Short Term Restrictive Housing resulting in more than 15 days within a 30-day period.

B.  The conditions of confinement for residents in short-term restrictive housing are to be followed according to IMPP 20-101A.

C.  Restraints are to be utilized during movement that occurs outside a resident's cell and/or unit, unless the use of restraints worsens a resident's condition, or the use of restraints is unwarranted.

1.  Exceptions to the use of restraints is to be granted by the Warden, or Chief of Security in the Warden's absence.

2.  Facility Wardens may establish procedures in General Orders for limited movement without

---

restraints for residents housed in double-bunked cell assignments, to activities such as showers and recreation.

III.  **Classification Categories and Independent Criteria for Placement in Short-Term Administrative Restrictive Housing**

A.  Pending results of investigation:

1.  Residents may be placed in administrative restrictive housing pending the completion of an investigation to determine whether charges are to be brought.

2.  Any resident held under pending results of an investigation is to be charged or released within three (3) working days, unless a continued holding in administrative restrictive housing under this section is justified in writing and approved by the Warden.

a.  This notice and explanation is to be provided to the resident in writing.

B.  To prevent the following:

1.  Further disruption, if a threat to security and control, including danger to others, continues to exist in the judgment of the Warden.

2.  The possible intimidation of witnesses or accusers; or

3.  Communication and collaboration between residents involving an attempt to improperly or dishonestly coordinate the testimony which might be given.

C.  Pre-hearing detention:

1.  If necessary to maintain security and control, any resident who has been charged with an alleged violation of law, or a class I or II rule violation, may be held in administrative restrictive housing pending a hearing before the facility disciplinary board, or pending a trial by a court.

a.  Time served in restrictive housing under pre-hearing detention is to be credited towards a sanction of disciplinary restrictive housing resulting from a disciplinary conviction.

b.  The resident's status is to be reviewed by the Warden or designee within three (3) working days.

D.  Communicable disease:

1.  Any resident whom a Doctor of Medicine, nurse, or nurse practitioner has declared to be carrying any communicable disease, or any resident who refuses to participate in testing for communicable disease, may be placed in administrative restrictive housing status until any danger of a contagion is past.

E.  Critical monitoring resident:

1.  As applicable administrative restrictive housing may be applied to the following types of residents. In the event such placement is made without a hearing, pursuant to Section I.B. of IMPP 20-105A, the Warden or his/her designee is to review the placement. Residents are to be assessed for application of the Offender Companion Program pursuant to IMPP 10-144A for constant observation.

a.  Any resident accused of or who has a history of aggressive or forcible sexual attacks may be placed in administrative restrictive housing.

b.  Any resident with suicidal tendencies may be placed in administrative restrictive

---

housing under appropriate observation providing the condition is verified by a qualified behavioral mental health professional and a clinical observation is not available.

c.  Any resident exhibiting self-injurious behavior under appropriate observation and to give clinical staff an opportunity to determine whether the injury is a significant indication of a suicidal tendency.

d.  Residents with behavioral, mental health, or emotional problems which cause them to be a threat to themselves or others, when that behavioral, mental health or emotional problem has been verified by a psychiatrist or psychologist, may be placed in administrative restrictive housing under appropriate observation when clinical observation is not available.

e.  Residents suspected to be under the influence of an illicit substance may be placed in restrictive housing under appropriate observation when clinical or unit observation is not available and not appropriate.

F.  Emergency situations:

1.  Any resident, or group of residents, may be placed in administrative restrictive housing or secure confinement in the resident(s) own cell(s) if the resident, or residents, engaged in behavior that threatened the maintenance, security, or control of the facility creating an emergency situation that presents a danger to the resident or others.

a.  A copy of this explanation and justification shall be provided to the Deputy Secretary of Corrections of Facilities Management.

b.  Placement may continue for up to three (3) working days.

2.  Any resident who has been determined by the Warden or, in the Warden's absence, by the Deputy Warden, to be an extreme risk of escape may be placed in administrative restrictive housing.

a.  The reason is to be explained in writing and reference made to the documents or other basis for the placement unless already apparent from the information shown in the resident's record.

b.  When these staff are absent during an emergency, restrictive housing may be authorized by the highest-ranking officer on duty.

(1)  The Warden or the Deputy Warden is to review the placement within 24-hours and must either approve continued placement in administrative restrictive housing or direct other appropriate housing.

G.  Holdovers:

1.  The Warden or designee may place residents in administrative restrictive housing who are identified as holdovers.

a.  Holdover residents are those residents who fall into one (1) of the following categories:

(1)  Any newly committed resident awaiting transportation to Topeka or El Dorado Correctional Facility reception and diagnostic unit.

(2)  Any resident who is otherwise being held in a facility temporarily while in transit between one facility and another; or,

(3)  Any parolee, conditional releasee, or post-release supervision releasee who has waived a preliminary violation hearing or is being held at a facility

pending a hearing to determine if probable cause exists that a violation of conditions of release occurred.

b. A resident is not to be held on holdover status longer than 15 days to accomplish the transfer to another facility.

H. Refusal to participate:

1. A resident may be placed in administrative restrictive housing when the resident refuses to participate in an identification procedure, including fingerprinting and photographing.

I. Disciplinary Restrictive Housing

1. Placement of any resident in disciplinary restrictive housing requires full compliance with all applicable provisions and requirements of the disciplinary procedures set forth within K.A.R. 44-13-101 *et seq.*

IV. Guidelines for Use of Long-Term Restrictive Housing

A. In the event that a resident presents an extended security threat due to violent and/or disruptive behaviors, or the influence of such, the Restrictive Housing Review Board is to complete and submit a long-term restrictive housing referral to the Warden for review and approval.

B. Restrictive housing placement in excess of 15 days requires extended planning and services for eventual placement into a general population setting.

1. Residents on long-term restrictive housing status are to have the same housing standards, conditions of confinement for short-term restrictive housing, and opportunities for three (3) hours or more a day out of cell time.

2. Facility General Orders are to specify the process for development of the planning and services specific for each individual resident.

V. Classification Categories and Independent Criteria for Placement in Long-Term Administrative Restrictive Housing

A. Consistent bad behavior:

1. Any resident may be placed in administrative restrictive housing indefinitely when the resident's record has shown consistent bad behavior, as evidenced by three (3) single events of documented bad behavior within the preceding 12 months, and when:

a. The instances are a substantial threat to the safety and security of the institution or facility; and

b. The instances arise from separate fact situations.

2. Placement under this classification requires the prior written approval of the warden and is to be within 30 days of approval by the Long-Term Restrictive Housing Committee.

B. Other security risk:

1. The Warden may place in administrative restrictive housing, or secure confinement in the resident's own cell, any resident or group of residents, if the resident or residents have engaged in behavior which has threatened the maintenance, security, or control of the correctional facility.

a. The Warden is to, within three (3) working days of the placement, explain in writing the threat to security and show justification for effecting secure confinement under these circumstances to the Deputy Secretary of Facility Management.

(1) An exception to the extended planning and services required under long-term restrictive housing placements may be requested with supporting written justification by the Warden.

(2) A copy of this explanation and justification shall be provided to the Secretary of Corrections.

C. Protective Custody:

1. Pursuant to IMPP 20-108 [Protective custody] any resident who requests restrictive housing for personal safety, or who the Warden has reason to believe to be in serious and imminent danger, may be placed in administrative restrictive housing if:

a. Documentation that protective custody is warranted is provided in writing by the Warden and reasonable alternatives are not available.

b. A denial of protective custody is to be fully documented in the EAI file.

VI. Timeframes Related to Administrative Restrictive Housing

A. For purpose of this regulation, the term "working days" means any day except Saturday, Sunday, a holiday, or any other day as authorized by the Governor.

NOTE: The policy and procedures set forth herein are intended to establish directives and guidelines for staff, residents and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees, residents or offenders, or an independent duty owed by the Department of Corrections to employees, residents, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure are not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS**

None.

**REFERENCES**

IMPP 10-110D, 10-144A, 12-120A, 20-105A, 20-108D

**HISTORY**

10-11-21 Original
05-13-22 Revision 1

**ATTACHMENTS**

None.